45 Cal.Rptr. 17, 403 P.2d 145]

[L. A. No. 27618. In Bank. June 23, 1965.]

DANIEL J. SEELY, Plaintiff and Appellant, v. WHITE MOTOR COMPANY, Defendant and Appellant.

John M. Nairn for Plaintiff and Appellant.

Baker, Palmer & Wall and Oran W. Palmer for Defendant and Appellant.

TRAYNOR, C. J.—In October 1959 plaintiff entered into a conditional sales contract with Southern Truck Sales for the purchase of a truck manufactured by defendant, White Motor Company. Plaintiff purchased the truck for use in his business of heavy-duty hauling. Upon taking possession of the truck, plaintiff found that it bounced violently, an action known as "galloping." For 11 months after the purchase, Southern, with guidance from White's representatives, made many unsuccessful attempts to correct the galloping. On July 22, 1960, when slowing down for a turn, plaintiff found that the brakes did not work. The truck overturned, and plaintiff, who was not personally injured, had the damage repaired for $5,466.09. In September 1960, after paying $11,659.44 of the purchase price of $22,041.76, plaintiff served notice that he would make no more payments. Southern thereafter repossessed the truck and resold it for $13,000.

Plaintiff brought this action against Southern and White

seeking (1) damages, related to the accident, for the repair of the truck, and (2) damages, unrelated to the accident, for the money he had paid on the purchase price and for the profits lost in his business because he was unable to make normal use of the truck. During the trial plaintiff dismissed the action against Southern without prejudice. The court found that White breached its warranty to plaintiff and entered judgment for plaintiff for $20,899.84, consisting of $11,659.44 for payments on the purchase price and $9,240.40 for lost profits. It found that plaintiff had not proved that the galloping caused the accident and therefore denied his claim for $5,466.09 for the repair of the truck. Both plaintiff and White appeal from the judgment.

■ Defendant contends that the trial court erred in awarding damages for lost profits and for the money paid on the purchase price of the truck. We do not agree with this contention. The award was proper on the basis of a breach of express warranty.

Defendant included the following promise in the printed form of the purchase order signed by plaintiff: ''The White Motor Company hereby warrants each new motor vehicle sold by it to be free from defects in material and workmanship under normal use and service, its obligation under the warranty being limited to making good at its factory any part or parts thereof. . . .'' This promise meets the statutory requirement for an express warranty: ''Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon.'' (Civ. Code, § 1732; cf. Com. Code, §§ 2313, 2314.)[1] The natural tendency of White's promise was to induce buyers to rely on it, and plaintiff did so rely in purchasing the goods. The reliance on the warranty, and the warranty itself, are manifested by plaintiff's continued efforts to have the truck repaired, and by defendant's acceptance of the responsibility to correct the galloping. ■ The statute requires only that plaintiff rely on the warranty. It does not additionally require that he be aware that it was made by the manufacturer instead of the dealer to reach the one who in fact made it. Surely if plaintiff sought to have a part replaced that was covered by the

---

[1] Effective January 1, 1965, the uniform sales act (Civ. Code, §§ 1721-1800) was revised, renumbered, and transferred to the Commercial Code. Citation is given to the comparable sections of both codes.

warranty, White could not escape its obligation by showing that plaintiff thought the warranty White made was made by the dealer.

Defendant contends that its limitation of its obligation to repair and replacement, and its statement that its warranty "is expressly in lieu of all other warranties, expressed or implied," are sufficient to operate as a disclaimer of responsibility in damages for breach of warranty. This contention is untenable. When, as here, the warrantor repeatedly fails to correct the defect as promised, it is liable for the breach of that promise as a breach of warranty. (*Rose* v. *Chrysler Motors Corp.*, 212 Cal.App.2d 755, 762-763 [28 Cal. Rptr. 185, 99 A.L.R.2d 1411] ; *Allen* v. *Brown*, 181 Kan. 301, 308 [310 P.2d 923].) Since there was an express warranty to plaintiff in the purchase order, no privity of contract was required. (See *Burr* v. *Sherwin Williams Co.*, 42 Cal.2d 682, 696 [268 P.2d 1041].) Plaintiff also gave reasonable notice of the defect. (Civ. Code, § 1769; cf. Com. Code, § 2607.)

 The damages awarded by the trial court, "the loss directly and naturally resulting in the ordinary course of events from the breach of warranty" (Civ. Code, § 1789, subd. 6; cf. Com. Code, § 2714), can properly include lost profits (*Grupe* v. *Glick*, 26 Cal.2d 680, 692 [160 P.2d 832] ; *Mack* v. *Hugh W. Comstock Associates, Inc.*, 225 Cal.App.2d 583, 587 [37 Cal.Rptr. 466]) as well as the amount paid on the purchase price. Defendant contends that plaintiff must elect between these remedies, relying on an analogy to the sales act requirement of election between rescission and damages. (Civ. Code, § 1789.) Since this action, however, is against the manufacturer for consequential damages and not against the immediate seller for rescission of the contract of sale, the sales act does not compel an election of remedies. The often critic'zed rule of election of remedies (see, e.g., Ezer, *The Impact of the Uniform Commercial Code on the California Law of Sales Warranties*, 8 U.C.L.A.L.Rev. 281, 330), has not been adopted by the Commercial Code (Com. Code, § 2608, comment 1), and should not be extended to apply here.

 Defendant also contends that the damages awarded are excessive since the rental value of the truck was not offset against plaintiff's claim for lost profits. Plaintiff replies that, in estimating that 60 per cent of the lost gross earnings was lost profits, the trial court deducted a reasonable rental value for the truck. We cannot say that the trial court failed to take rental value into account when it evaluated the estimates

of profit percentage that ranged from 25 per cent to 77 per cent. ▉ Since defendant failed to request a finding on the issue of an appropriate rental value, it cannot complain that a specific finding was not made. (Code Civ. Proc., § 634.)

It is contended that the foregoing legislative scheme of recovery has been superseded by the doctrine of strict liability in tort set forth in *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897], and *Vandermark* v. *Ford Motor Co.*, 61 Cal.2d 256, 261 [37 Cal.Rptr. 896, 391 P.2d 168]. We cannot agree with this contention. The law of sales has been carefully articulated to govern the economic relations between suppliers and consumers of goods. ▉ The history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions of the sales act or of the Uniform Commercial Code but, rather, to govern the distinct problem of physical injuries.

An important early step in the development of the law of products liability was the recognition of a manufacturer's liability in negligence to an ultimate consumer without privity of contract. (*Macpherson* v. *Buick Motor Co.* (1916) 217 N.Y. 382, 389 [111 N.E. 1050, L.R.A. 1916F 696].) About the same time, the courts began to hold manufacturers liable without negligence for personal injuries. Over a score of theories were developed to support liability (see Gillam, *Products Liability in a Nutshell,* 37 Ore.L.Rev. 119, 153-155), and the one that was generally accepted was borrowed from the law of sales warranty. (See Prosser, *The Assault Upon the Citadel,* 69 Yale L.J. 1099, 1126.) "Only by some violent pounding and twisting," however, could the warranty doctrine be made to serve this purpose. (Patterson, *The Apportionment of Business Risks Through Legal Devices,* 24 Colum.L.Rev. 335, 358; see also Prosser, *supra,* 69 Yale L.J. 1099, 1124-1134.) Final recognition that "The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales" (*Ketterer* v. *Armour & Co.*, 200 F. 322, 323; *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57, 64 [27 Cal.Rptr. 697, 377 P.2d 897]) caused this court to abandon the fiction of warranty in favor of strict liability in tort. (*Greenman* v. *Yuba Power Products, Inc., supra,* at p. 63; *Vandermark* v. *Ford Motor Co.*, 61 Cal.2d 256, 261 [37 Cal.Rptr. 896, 391 P.2d 168].)

▉ The fact that the warranty theory was not suited to the field of liability for personal injuries, however, does not mean that it has no function at all. In *Greenman* we recog-

nized only that "rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by its defective products unless those rules also serve the purposes for which such liability is imposed." (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 63.) Although the rules governing warranties complicated resolution of the problems of personal injuries, there is no reason to conclude that they do not meet the "needs of commercial transactions." The law of warranty "grew as a branch of the law of commercial transactions and was primarily aimed at controlling the commercial aspects of these transactions." (See James, *Products Liability,* 34 Tex.L.Rev. 192; Llewellyn, *On Warranty of Quality, and Society,* 36 Colum.L.Rev. 699, 37 Colum.L.Rev. 341.)

Although the rules of warranty frustrate rational compensation for physical injury, they function well in a commercial setting. (See Com. Code, § 2719; Prosser, *supra,* 69 Yale L.J. 1099, 1130, 1133.) These rules determine the quality of the product the manufacturer promises and thereby determine the quality he must deliver. In this case, the truck plaintiff purchased did not function properly in his business. Plaintiff therefore seeks to recover his commercial losses: lost profits and the refund of the money he paid on the truck. White is responsible for these losses only because it warranted the truck to be "free from defects in material and workmanship under normal use and service." The practical construction of this language by both parties during the 11 months that repairs were attempted establishes that plaintiff's use of the truck was a normal use within the meaning of the warranty. (See *Woodbine* v. *Van Horn,* 29 Cal.2d 95, 108 [173 P.2d 17].) White's failure to comply with its obligation to make "good at its factory any part or parts" of the truck after ample opportunity was given it to do so, entitles plaintiff to recover damages resulting from such breach. Had defendant not warranted the truck, but sold it "as is," it should not be liable for the failure of the truck to serve plaintiff's business needs.

Under the doctrine of strict liability in tort, however, the manufacturer would be liable even though it did not agree that the truck would perform as plaintiff wished or expected it to do. In this case, after plaintiff returned the truck, Southern resold it to Mr. Jack Barefield, an experienced trucker. Mr. Barefield used the truck "to pull a 40-foot band" over state highways. After driving the truck 82,000 miles, he

testified that he had no unusual difficulty with it. Southern replaced two tires, added a new fifth wheel, and made minor alterations to the truck before reselling it to Mr. Barefield, so that it is possible that it found a cure for the galloping. Southern, however, replaced the tires five times, adjusted the fifth wheel, and made many other changes on the truck during the 11 months plaintiff drove it.[2] Thus, it is more likely that the truck functioned normally when put to use in Mr. Barefield's business because his use made demands upon it different from those made by plaintiff's use. If under these circumstances defendant is strictly liable in tort for the commercial loss suffered by plaintiff, then it would be liable for business losses of other truckers caused by the failure of its trucks to meet the specific needs of their businesses, even though those needs were communicated only to the dealer. Moreover, this liability could not be disclaimed, for one purpose of strict liability in tort is to prevent a manufacturer from defining the scope of his responsibilty for harm caused by his products. (*Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897].) The manufacturer would be liable for damages of unknown and unlimited scope. Application of the rules of warranty prevents this result. Defendant is liable only because of its agreement as defined by its continuing practice over 11 months. Without an agreement, defined by practice or otherwise, defendant should not be liable for these commercial losses.

In *Santor* v. *A & M Karagheusian, Inc.*, 44 N.J. 52 [207 A.2d 305], the plaintiff purchased from a retailer carpeting that soon began to develop unusual lines. The court held the manufacturer liable for the difference between the price paid for the carpet and its actual market value on the basis of strict liability in tort. We are of the opinion, however, that it was inappropriate to impose liability on that basis in the *Santor* case, for it would result in imposing liability without regard to what representations of quality the manufacturer made. It was only because the defendant in that case marketed the rug as Grade #1 that the court was justified in holding

---

[2]The following changes were made on the truck: five sets of front springs; five drive line changes; alteration of back springs; replacement of front shock absorbers; fish plating of frame; replacement of clutch brake; replacement of two clutch release bearings; replacement of pilot bearing; replacement of two auxiliary transmissions; reinstallation of new front bearings; front end aligned six times; entire truck and trailer aligned twice; welded cross member; new cross member installed; replaced tires five times; moved fifth wheel back and forth,

that the rug was defective. Had the manufacturer not so described the rug, but sold it "as is," or sold it disclaiming any guarantee of quality, there would have been no basis for recovery in that case. Only if someone had been injured because the rug was unsafe for use would there have been any basis for imposing strict liability in tort.

The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone. (*Wyatt* v. *Cadillac Motor Car Division,* 145 Cal.App.2d 423, 426 [302 P.2d 665], disapproved on other grounds in *Sabella* v. *Wisler,* 59 Cal.2d 21, 31 [27 Cal.Rptr. 689, 377 P.2d 889]; *Trans World Airlines* v. *Curtiss-Wright Corp.,* 1 Misc.2d 477 [148 N.Y.S.2d 284, 290].) The Restatement of Torts similarly limits strict liability to physical harm to person or property. (Rest. 2d Torts (Tent. Draft No. 10), § 402 A.)

The law of warranty is not limited to parties in a somewhat equal bargaining position. Such a limitation is not supported by the language and history of the sales act and is unworkable. Moreover, it finds no support in *Greenman.* The rationale of that case does not rest on the analysis of the financial strength or bargaining power of the parties to the particular action. It rests, rather, on the proposition that "The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of

doing business.'' (*Escola* v. *Coca Cola Bottling Co.*, 24 Cal. 2d 453, 462 [150 P.2d 436] [concurring opinion].) That rationale in no way justifies requiring the consuming public to pay more for their products so that a manufacturer can insure against the possibility that some of his products will not meet the business needs of some of his customers. ▉ Finally, there was no inequality in bargaining position insofar as the damages plaintiff recovered in this case are concerned. Unlike the defendant in *Henningsen* v. *Bloomfield Motors, Inc.*, 32 N.J. 358 [161 A.2d 69, 75 A.L.R.2d 1], White is not seeking to enforce an industry-wide disclaimer of liability for personal injuries. Here, plaintiff, whose business is trucking, could have shopped around until he found the truck that would fulfill his business needs. He could be fairly charged with the risk that the product would not match his economic expectations, unless the manufacturer agreed that it would. Indeed, the Uniform Commercial Code expressly recognizes this distinction by providing that limitation of damages is prima facie unconscionable in personal injury cases, but not in cases of commercial loss. (Com. Code, § 2719.)

▉ Plaintiff contends that, even though the law of warranty governs the economic relations between the parties, the doctrine of strict liability in tort should be extended to govern physical injury to plaintiff's property, as well as personal injury. We agree with this contention. Physical injury to property is so akin to personal injury that there is no reason to distinguish them. (See Prosser, *supra*, 69 Yale L.J. 1099, 1143; Rest. 2d Torts (Tent. Draft No. 10), § 402 A; cf. *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897].) ▉ In this case, however, the trial court found that there was no proof that the defect caused the physical damage to the truck. The finding of no causation, although ambiguous, was sufficient absent a request by plaintiff for a specific finding. (See Code Civ. Proc., § 634.) Since the testimony on causation was in conflict, the trial court's resolution of the conflict is controlling.

The judgment is affirmed, each side to bear its own costs on these appeals.

McComb, J., Tobriner, J., Peek, J., Mosk, J., and Burke, J., concurred.

PETERS, J., Concurring and Dissenting.—I concur in the affirmance of the judgment, but on grounds different from the

majority. The majority permit recovery on the theory that there was a breach of an express warranty. Then the majority say, unnecessarily and gratuitously, that plaintiff cannot recover on the theory of strict liability. Both the holding and the dicta are, in my opinion, incorrect.

There was no breach of express warranty. It is fundamental that no one is liable for the breach of an express warranty unless the buyer *relies* upon that warranty (former Civ. Code, § 1732) or unless the warranty constitutes "part of the basis of the bargain" (Com. Code, § 2313). Here, the undisputed facts show that plaintiff did *not* rely on White being responsible under the warranty, and it is clear that White's responsibility was not "part of the basis of the bargain." The uncontradicted evidence demonstrates that plaintiff had no idea that White was a party to the warranty and that he relied solely on Southern's responsibility.[1] The majority say that the statute requires only that plaintiff rely on "the warranty," and not that he be aware of who made it. But one does not rely upon a mere scrap of paper which calls itself a warranty. He relies on the fact that a certain responsible party (which he may know as "the manufacturer" rather than by name) will "stand behind" the product and perform in accordance with the terms of the warranty. Here plaintiff admits that he relied on Southern's responsibility under the warranty, but not on White's.

The majority, having found in favor of the plaintiff on the theory of an express warranty, completely decided the case. There was no need to discuss the strict liability doctrine. Everything said by the majority on that subject is obviously dicta. The problem of what damages may be recovered in an action based on strict liability is a most important question of first impression in this state. It is too important to be decided in a mere "advisory opinion." But because the majority have elected to discuss it, and have done so, I submit, erroneously, I cannot allow the erroneous dicta to go unchallenged.

---

[1]Plaintiff had read a warranty provision on a copy of the contract that was not used. He did not read the warranty provision in the contract that was used, but assumed it was identical to the provision he had read (which it apparently was). He was asked at trial:

"Q. Well, you understood from the other warranty which you read that the warranty that was made was made to you by the White Motor Company, did you not? A. No, I didn't understand that at all.

". . . . . . . . .

"You understood from that White Motor Company was the one that was making the warranty to you, didn't you? A. No, sir."

Given the rationale of *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897], it cannot properly be held that plaintiff may not recover the value of his truck and his lost profits on the basis of strict liability. The nature of the damage sustained by the plaintiff is immaterial, so long as it proximately flowed from the defect. What *is* important is not the nature of the damage but the relative roles played by the parties to the purchase contract and the nature of their transaction.

Recently in *Santor* v. *A & M Karagheusian, Inc.* (1965) 44 N.J. 52 [207 A.2d 305], the Supreme Court of New Jersey held that the strict liability theory California adopted in *Greenman* applies to "economic loss" as well as to personal injury damages. There plaintiff bought carpeting from a local retailer. When the carpeting became useless because of certain defects, plaintiff sued the manufacturer. In allowing plaintiff to recover the difference between the price he paid and the actual market value of the carpeting, the court expressly disapproved the concept that the strict liability doctrine should be restricted to personal injury claims. "[A]lthough the doctrine has been applied principally in connection with personal injuries sustained by expected users from products which are dangerous when defective, . . . the responsibility of the maker should be no different where damage to the article sold or to other property of the consumer is involved." (207 A.2d at p. 312.) It should be noted that there, as here, the court was faced with a statutory scheme covering implied warranties. Unlike the majority here, however, the New Jersey court expressly refused to draw an arbitrary distinction between different types of damage in order to give effect to those statutes in a greater number of situations.

Of course, the application of the strict liability theory to property damage (including "economic loss") will limit the applicability of several sections of the recently enacted Commercial Code dealing with implied warranties (see, e.g., Com. Code, §§ 2607, 2719). But this result, even if unfortunate, follows from the rationale of *Greenman,* which limited the effect of a statute requiring the purchaser to give defendant notice of a breach of warranty within a reasonable time (former Civ. Code, § 1769). In the present case, it is not necessary to "extend" *Greenman* in order to reach the proper result. All that is required is that we apply its reasoning to

a factual situation which cannot be distinguished analytically from that case.

In *Greenman* we allowed recovery for "personal injury" damages. It is well established that such an award may include compensation for past loss of time and earnings due to the injury (*Storrs* v. *Los Angeles Traction Co.*, 134 Cal. 91, 93 [66 P. 72]), for loss of future earning capacity (*Bonneau* v. *North Shore R.R. Co.*, 152 Cal. 406, 414 [93 P. 106, 125 Am.St.Rep. 68]), and for increased living expenses caused by the injury (*Kline* v. *Santa Barbara etc. Ry. Co.*, 150 Cal. 741, 748-749 [90 P. 125]). There is no logical distinction between these losses and the losses suffered by plaintiff here. All involve economic loss, and all proximately arise out of the purchase of a defective product. I find it hard to understand how one might, for example, award a traveling salesman lost earnings if a defect in his car causes his *leg* to break in an accident but deny that salesman his lost earnings if the defect instead disables only his *car* before any accident occurs. The losses are exactly the same; the chains of causation are slightly different, but both are "proximate." Yet the majority would allow recovery under strict liability in the first situation but not in the second. This, I submit, is arbitrary.[2]

The "history" of products liability law does not compel a dichotomy between "economic loss" and other types of damage. Although the various products liability doctrines developed in the field of personal injury claims, the overwhelming majority of courts *today* make no distinction between personal injury damages and property damages (including "economic loss") in products liability cases.[3] If

[2] The majority make another arbitrary distinction when they state that they *would* allow recovery in strict liability for the damage caused to plaintiff's truck in his accident, if plaintiff had proved that the defect *caused* the accident. Unlike the majority, I can attribute no significance to the fact that these damages sought by plaintiff were not caused by a collision with an external object in a sudden accident. I cannot rationally hold that the plaintiff whose vehicle is destroyed in an accident caused by a defective part may recover his property damage under a given theory while another plaintiff who is astute or lucky enough to discover the defect and thereby avoid such an accident cannot recover for other damages proximately caused by an identical defective part. The strict liability rule should apply to both plaintiffs or to neither. They cannot be validly distinguished.

[3] Approaching our strict liability doctrine, the following cases have held that "privity" is not necessary in an action for breach of implied warranty and have applied this rule to allow recovery against a manufacturer for property damage: *Duckworth* v. *Ford Motor Co.* (D.C.E.D.Pa. 1962) 211 F.Supp. 888; *Picker X-Ray Corp.* v. *General Motors Corp.* (Mun.Ct. App.D.C. 1962) 185 A.2d 919; *State Farm Mut. Auto. Ins. Co.* v. *Ander-*

no such distinction was made under the products liability doctrines in use *before Greenman,* then such a distinction *under Greenman's* strict liability doctrine may be reasonably (though not necessarily) made only on the basis that protection of life and limb is of greater social value than protection against financial loss. But, as money damages do not replace the life or limb lost, this basis is sound only to the extent that allowing recovery for personal injuries on a strict liability theory operates as a *deterrent* (vis-a-vis the theories formerly used) which induces manufacturers to be *more* careful in their production methods. But it is highly doubtful that *Greenman's* imposition of strict liability does furnish such a deterrent, in view of the fact that, at the time *Greenman* was rendered, the doctrine of res ipsa loquitur and the weakening of the "privity" requirement in implied warranty actions would have often subjected the manufacturer to liability, or at least to litigation, in any event, whenever a defect in his product caused an injury. (See, e.g., *Escola* v. *Coca Cola Bottling Co.,* 24 Cal.2d 453 [150 P.2d 436], and *Peterson* v. *Lamb Rubber Co.,* 54 Cal.2d 339 [5 Cal.Rptr. 863, 353 P.2d 575].) "A skeptic may well question whether the callous manufacturer, who is unmoved by the prospect of negligence liability, plus *res ipsa loquitur,* and by the effect of any injury whatever upon the reputation of his goods, will really be stimulated by the relatively slight increase in possible liability to take additional precautions against defects which cannot be prevented by only reasonable care." (Prosser, *The Assault upon the Citadel* (1960) 69 Yale L.J. 1099, 1119.)[4] The purpose of the strict liability

son-*Weber, Inc.* (1961) 252 Iowa 1289 [110 N.W.2d 449]; *Morrow* v. *Caloric Appliance Corp.* (Mo. 1963) 372 S.W.2d 41; *Pabon* v. *Hackensack Auto Sales, Inc.* (1960) 63 N.J.Super. 476 [164 A.2d 773]; *50 New Walden, Inc.* v. *Federal Ins. Co.* (Sup.Ct. 1963) 30 Misc.2d 460 [241 N.Y.S.2d 128]; *Jarnot* v. *Ford Motor Co.* (Pa. 1959) 191 Pa.Super. 422 [156 A.2d 568]. The following cases have abolished privity in permitting recovery for damages involving the loss of (or reduced value of) the purchased product itself, where no "accident" occurred: *Gladiola Biscuit Co.* v. *Southern Ice Co.* (5th Cir. 1959) 267 F.2d 138; *Hoskins* v. *Jackson Grain Co.* (Fla. 1953) 63 So.2d 514; *Continental Copper & Steel Industries, Inc.* v. *E. C. "Red" Cornelius, Inc.* (Fla.App. 1958) 104 So.2d 40. Nor was privity required in *Mazetti* v. *Armour & Co.* (1913) 75 Wash. 622 [135 P. 633, Ann.Cas. 1915C 140, 48 L.R.A. N.S. 213], where plaintiff sought and recovered damages for loss of profits and loss of goodwill only.

[4]See Plant, *Strict Liability of Manufacturers for Injuries Caused by Defects in Products—An Opposing View* (1957) 24 Tenn.L.Rev. 938, where it is said (at p. 945): "[W]hat is probably a more powerful incentive to make products as safe as possible lies in the desire of manufacturers to avoid the danger that their products will develop a reputa-

rule as expressed in *Greenman* is not to deter, but "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, at p. 63.) The initial breakthroughs in products liability law may well have operated as deterrents when measured against the former status of the law, which gave the consumer little protection against the manufacturer's carelessness. At that time, a distinction between personal injuries and other types of damage might have been justified. But given the equal treatment of all types of damage under the law as it existed just before *Greenman,* it makes no sense to adopt a new doctrine (strict liability in tort) for reasons *other* than deterrence and then hold that this doctrine is limited by a distinction which can be justified only if the doctrine were a deterrent. The New Jersey Supreme Court responded to this historical argument in *Santor,* "True, the rule of implied warranty had its gestative stirrings because of the greater appeal of the personal injury claim. But, once in existence, the field of operation of the remedy should not be fenced in by such a factor." (*Santor* v. *A & M Karagheusian, Inc., supra,* 207 A.2d 305, at p. 309.)

The majority suggest that the manufacturer should bear (and spread) the risk of personal injury damages because "the cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured...." This is no reason to distinguish between personal injury damages and other types of damage. Such "overwhelming misfortune" may not be present in a given personal injury case, but the majority do not indicate that they would deny recovery in a personal injury case if this element were lacking. Conversely, an economic loss might be an "overwhelming misfortune" in a given case, but I doubt that any court

tion for being unsafe or defective and therefore be unacceptable to the purchasing public. Every manufacturing executive with whom the writer has discussed this matter regards it as a potential commercial disaster when one of its products is found to be defective and the cause of an injury. The element which is most disturbing to manufacturers is not the potential judgment of legal liability but the injury which is done to the reputation of the product and its producer. While it may be conceivable that the imposition of strict liability could increase in some small measure the pressure upon a few backward manufacturers to make their product safe, it is doubtful that it will add very much to existing pressures."

See also Bogert and Fink, *Business Practice Regarding Warranties in the Sale of Goods* (1930) 25 Ill.L.Rev. 400, 415-416.

would allow recovery in such a case and deny it in other economic loss cases. "Overwhelming misfortunes" *might* occur more often in personal injury cases than in property damage or economic loss cases (although the majority cite no evidence to this effect), but this is no reason to draw the line between these types of injury when a more sensible line is available. Suppose, for example, defective house paint is sold to two home owners. One suffers temporary illness from noxious fumes, while the other's house is destroyed by rot because the paint proved ineffective (a loss generally uninsured). Although the latter buyer may clearly suffer the greater misfortune, the majority would not let him recover under the strict liability doctrine because *his* loss is solely "economic," while letting the first buyer recover the minimal costs and lost earnings caused by his illness.

The majority unduly fear that, if the strict liability rule is applied to economic loss, "The manufacturer would be liable for damages of unknown and unlimited scope." This would not be so if the notion of "defective" in the strict liability doctrine is viewed as coextensive with the concept of "unmerchantable" in the implied warranty field. This term has been well defined by case law and has been deemed to be certain enough for use in our recently enacted Commercial Code (see § 2314). Equating "defective" with "unmerchantable" comports with the purpose of *Greenman,* which was not to expand the notion of when the manufacturer has breached his initially implied duty to the purchaser, but only to eliminate the sales law's restrictions on *recovery* for that breach of duty (the privity and notice requirements and the operation of disclaimers) where the buyer is an ordinary consumer.

The majority also point to Mr. Barefield's alleged success with the truck and state that "If under these circumstances defendant is strictly liable in tort for the commercial loss suffered by plaintiff, then it would be liable for business losses of other truckers caused by the failure of its trucks to meet the specific needs of their businesses, even though those needs were communicated only to the dealer." Here the majority seem to equate strict liability and the implied warranty of fitness for a particular purpose. (See Com. Code, § 2315.)[5] No authority

---

[5]"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." (See also former Civ. Code, § 1735, subd. (1).)

is cited for this proposition, and I have found none. So far as I know, no proponent of the concept of manufacturers' strict liability has ever seriously argued that the manufacturer should be liable for the product's inability to serve specific needs which the buyer communicates only to the retailer, except insofar as those needs conform to what the product is ordinarily expected (by the manufacturer and the consuming public) to do. Mr. Barefield's testimony went only to show that the truck *could* do "the jobs for which it was built" (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 64), i.e., that it was merchantable. Apparently he did not convince the trial court. I fail to see how this testimony tends to support the majority's "horrible consequences" argument, for there is no indication that the trial court relied on plaintiff's or Barefield's *communications* of their needs to the dealer in finding the truck to be "defective."

The majority recognize that the rules governing warranties were developed to meet the needs of "commercial transactions." If this is so, then why not look to the *transaction* between the buyer and the seller and see if it was a "commercial" transaction rather than a sale to an ordinary consumer at the end of the marketing chain? How can the nature of the damages which occur *later,* long after the transaction has been completed, control the characterization of the transaction? Any line which determines whether damages should be covered by warranty law or the strict liability doctrine should be drawn at the time the sale is made.

In *Greenman,* we relied to some degree upon *Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358 [161 A.2d 69, 75 A.L.R.2d 1]. *Henningsen* held a manufacturer liable by holding privity to be unnecessary in an implied warranty action and held that the manufacturer's disclaimer of all warranties was contrary to public policy and therefore void. This was based upon a realistic appraisal of the "freedom of contract" commonly vested in the consumer in today's economy, where gross inequality of bargaining power is pervasive. "The traditional contract is the result of free bargaining of parties who are brought together by the play of the market, and who meet each other on a footing of approximate economic equality. In such a society there is no danger that freedom of contract will be a threat to the social order as a whole. But in present-day commercial life the standardized mass contract has appeared. It is used primarily by enterprises with strong bargaining power and position. 'The weaker party, in need of the goods or services, is frequently not in a position

to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses. His contractual intention is but a subjection more or less voluntary to terms dictated by the stronger party, terms whose consequences are often understood in a vague way, if at all.' " (*Henningsen* v. *Bloomfield Motors, Inc., supra* (N.J. 1960) 161 A.2d at p. 86.)

I am not concerned over the fact that if damages on the strict liability theory are allowed here, this may limit the application of some of the restrictive statutory provisions relating to warranty. In my opinion those restrictive provisions should not apply to the ordinary consumer, who is usually unable to protect himself from insidious contractual provisions such as disclaimers, foisted upon him by commercial enterprises whose bargaining power he is seldom able to match, *and* who " 'is seldom "steeped in the business practice which justifies . . .'' ' " the notice requirement (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, at p. 61), *and* who should not be barred by the privity requirement (see fn. 3, *supra*). The purpose of the strict liability rule adopted in *Greenman* was to protect people who are "powerless to protect themselves." (*Id.* at p. 63.) This does not mean, however, that the implied warranty sections of the code should not apply *within* the world of commerce, where parties generally bargain on a somewhat equal plane and may be presumed to be familiar with the legal problems involved when defective goods are purchased.[6]

Although this is a close case, I would find that plaintiff was an ordinary consumer insofar as the purchase involved here was

---

[6]See Note, *Disclaimers of Warranty in Consumer Sales* (1963) 77 Harv. L.Rev. 318, 327-328: "A thwarting of the policies behind warranty need not attend recognition of disclaimers in the commercial world. There the buyer may be just as able to absorb and administer the inevitable risks of the seller's operations. Indeed, the seller may be an essential experimental or otherwise marginal entrepreneur who would be unable profitably to bear the recurrent costs of strict liability. There is common recourse to insurance. The size of the transactions and the access to technical knowledge make attempts to prove negligence more feasible. Buyers may even dictate the design, and thus be in a position to prevent the losses to which they are exposed. They are more capable of protecting themselves by caution and testing, and their own manufacturing processes and quality control systems stand between the object and ultimate users or bystanders.

"In sales by mass producing and marketing enterprises to individual consumers, however, the reasons for recognition of disclaimers are rarely applicable. When they are, recognition of the disclaimers they support is usually not compatible with realization of the policies behind warranties. The comparative helplessness of the modern consumer generally eliminates the possibility of a free and informed choice to assume a risk, of a course

concerned, even though he bought the truck for use in his business. Plaintiff was an owner-driver of a single truck he used for hauling and not a fleet-owner who bought trucks regularly in the course of his business. He was the final link in the marketing chain, having no more bargaining power than does the usual individual who purchases a motor vehicle on the retail level.

I recognize that this ''ordinary consumer'' test needs judicial definition. This should be done on a case-by-case basis as is customarily done with any new doctrine. It is, however, the best resolution of the dilemma facing this court. I assume that the majority do not wish to overrule *Greenman*. On the other hand, neither the majority nor I wish to extend *Greenman* so as to completely deny any effect to the disclaimer and notice provisions of the Commercial Code. Thus, a line must be drawn somewhere. The line drawn by the majority is arbitrary and artificial, there being no sound basis for distinguishing between the types of damage assigned to opposite sides of the majority's line. The line I suggest would seem to fit squarely within the reasons for the strict liability rule.

The majority object to applying the strict liability doctrine to economic loss because they feel that the manufacturer should be able to sell its product ''as is.'' But this objection overlooks the fact that the strict liability rule would allow the manufacturer to do this in certain cases. The strict liability rule, for example, permits the defense of assumption of risk. ''Here, as elsewhere, the plaintiff will not be heard to complain of a risk which he has encountered voluntarily, or brought upon himself with full knowledge and appreciation of the danger.'' (Prosser, Torts (3d ed. 1964) p. 539.)[7]

---

of negotiations which may be evidenced in a contract, or of a true bargain. And whenever the cost of an inevitable risk is borne by the consumer, it cannot be administered to those who benefit from it or serve as an incentive to improvement.''

See also Llewellyn, *On Warranty of Quality, and Society* (1936) 36 Colum.L.Rev. 699, 712-713, 721; Prosser, *The Assault upon the Citadel, supra* (1960) 69 Yale L.J. 1099, 1133.

[7] Where some manufacturers of a given product disclaim liability and others do not, then a consumer who buys from a disclaiming manufacturer, knowing of the disclaimer, has ''assumed the risk.'' He has a ''reasonable alternative'' (*id.* at p. 540), buying from a manufacturer who did not disclaim (and perhaps paying a higher price for the manufacturer to retain these risks). When all manufacturers disclaim, however, then it can hardly be said that a buyer assumes the risk imposed by such a disclaimer when he buys that product. Of course, even if all manufacturers have disclaimers, if the consumer buys a product raising a greater risk of injury (economic or personal) than those of the other manufacturers (perhaps because the product is cheaply made or of an experimental design), knowing of this increased risk, then the buyer has assumed the added risk. He could have purchased a safer product. Under

To sum up, all the strict liability rule does to implied warranty law is abolish the notice requirement, restrict the effectiveness of disclaimers to situations where it can be reasonably said that the consumer has freely assumed the risk, and abolish the privity requirement, where ordinary consumers are involved. It does not introduce a notion of ''defective'' which is different from that of ''unmerchantable'' in implied warranty law. These changes properly adapt traditional sales law to the marketing position of today's ordinary consumer. Under the majority dicta, which would deny plaintiff the price of his truck as well as his lost profits on a strict liability theory, the housewife who buys a new refrigerator with such a serious defect as to make it useless cannot recover for the loss of her purchase price from the manufacturer (unless there is an express warranty), because of the privity doctrine (*Burr* v. *Sherwin Williams Co.*, 42 Cal.2d 682, 695-696 [268 P.2d 104]). Should the privity doctrine be abolished, the manufacturer's disclaimer of implied warranties would bar her, even if she could not buy a new refrigerator without a similar disclaimer. Further, if there were no disclaimer, her failure to give the manufacturer reasonable notice of the defect would bar her effort to recover. These results cannot be reconciled with the holding and rationale of *Greenman*.

Thus, although I would affirm, I would do so on the basis of the strict liability doctrine.

The petition of the defendant and appellant for a rehearing was denied July 21, 1965. Peters, J., was of the opinion that the petition should be granted.

the facts involved in this case, of course, we need not be concerned with this problem, for the majority properly found that White's attempt to limit its liability was ineffective, for White failed to perform even its limited obligation to plaintiff.