**CINNAMINSON TOWNSHIP BOARD OF EDUCATION, Plaintiff,**

v.

**U.S. GYPSUM CO., "X, Y, Z, Companies," fictitious names for presently unidentified entities more fully described hereinbelow, and "John Doe Companies," fictitious names for presently unidentified entities more fully described hereinbelow, Defendants.**

Civ. No. 80–1842.

United States District Court,
D. New Jersey.

Dec. 14, 1982.

As Amended Dec. 16, 1982.

Michael J. Vassalotti, Brown, Connery, Kulp, Wille, Purnell & Greene, Camden, N.J., for plaintiff.

William F. Keating, Capehart & Scatchard, P.A., Moorestown, N.J., Richard P. Brown, Jr., George E. Liberman, John G. Rainey, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant U.S. Gypsum Co.

## OPINION

ANNE E. THOMPSON, District Judge.

This matter comes before the court upon motion by defendant United States Gypsum Co. ["USG"] for summary judgment pursuant to Rule 56 of the *Federal Rules of Civil Procedure*. The motion presents the court with both interesting and rather novel issues of the doctrine of strict liability in tort.

The suit arises out of the construction of four schools by the Cinnaminson Township Board of Education ["Board" or "Township"] from 1959 through 1964. Plaintiff filed this suit on May 14, 1980 against USG and other manufacturers of acoustical plaster containing asbestos used in the ceilings of the four schools.[1] Once plaintiff discovered that the asbestos in the ceilings posed a health hazard, it had to remove the ceiling plaster at a cost in excess of one million dollars. The Board seeks to recover the cost of removal and replacement under theories of strict liability in tort, breach of warranty and negligence. Plaintiff has also brought a claim for punitive damages.

Defendant USG contends that it is entitled to summary judgment because:

1) If presented with the issue today, the Supreme Court of New Jersey would allow tort recovery only in products liability actions alleging personal injury or property damage, and not merely economic loss;

2) Plaintiff's warranty claims are barred by the statute of limitations;

3) Plaintiff's economic loss tort claims are barred by the statute of limitations;

---

1. The other named defendant in this action, National Gypsum Company, has already had its motion for summary judgment granted. Final judgment has been entered on its behalf.

4) All claims are barred by the ten year statute of repose for actions arising out of deficiencies in the design or construction of improvements to real property; and

5) Plaintiff may not recover punitive damages in an action for economic loss.

*Economic Loss and Strict Liability in Tort*

The Supreme Court of New Jersey has long been a leader in the development of the doctrine of strict liability in tort. *See, e.g., Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 161 A.2d 69 (1960). In *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), the plaintiff had purchased defective carpeting manufactured by the defendant and sold by the third-party retailer. The Supreme Court of New Jersey affirmed the trial court's determination that the defendant had breached an implied warranty of fitness even though there was no privity between the purchaser and the manufacturer. *Id.* at 63, 207 A.2d 305. Although it may be termed dicta, the court stated that it seemed "important to observe ... that the manufacturer's liability may be cast in simpler form." *Id.* Plaintiff also possessed a cause of action founded in principles of strict liability in tort. Since "the great mass of the purchasing public has neither adequate knowledge nor sufficient opportunity to determine if articles bought or used are defective," the court determined that the manufacturer should be the one to bear the costs of harm caused by the defects in the products which they market. *Id.* at 64–65, 207 A.2d 305. Thus, even where there was no personal injury or property damage as a result of the defect in the product, but merely what has been termed "economic loss," the court applied the doctrine of strict liability in tort.

Defendant USG has asserted that the Supreme Court of New Jersey would not follow this dicta if squarely presented with the issue today. USG is correct in its contention that most courts have rejected *Santor* when economic loss alone is at stake. It is also true that in *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.,* 626 F.2d 280 (3d Cir.1980) and *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165 (3d Cir.1981), the court rejected application of the *Santor* holding in construing Illinois and Pennsylvania law respectively.

■ The court's task, however, is to construe New Jersey law. As the United States Court of Appeals for the Third Circuit has recently reiterated, " 'a federal court must be sensitive to the doctrinal trends of the state whose law it applies, and the policies which inform the prior adjudications by the state courts.' " *Bruffett v. Warner Communications, Inc.,* 692 F.2d 910 at 918 (3d Cir.1982) (quotation omitted). Although the court is not bound by dicta or by lower court decisions in making its prediction of how the state's highest court would rule, the court must look to these and other statements of the state supreme court as indicia of how that court would decide the case. *Glass Sand, supra,* at 1167.

The court is not confident that the Supreme Court of New Jersey would abandon the *Santor* doctrine in the face of contrary court decisions. "One of the authentic obligations of federalism at the judicial level requires that we permit the state courts to decide whether and to what extent they will follow the emerging law." *Bruffett, supra,* at 920.

■ The New Jersey courts have repeatedly cited *Santor* for the proposition that damages for economic loss may be recoverable under a strict liability in tort theory. *See, e.g., Herbstman v. Eastman Kodak Co.,* 68 N.J. 1, 7, 342 A.2d 181 (1975); *Heavner v. Uniroyal, Inc.,* 63 N.J. 130, 147, 152, 305 A.2d 412 (1973). *Accord, ICI Australia Ltd. v. Elliott Overseas Co.,* 551 F.Supp. 265 at 268 (D.N.J.1982). In *Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 350, 431 A.2d 811 (1981), the court noted that "[t]he progressive character of New Jersey decisional law in the area of strict products liability is well known ... Suffice it to say that this Court has long recognized the significance of the social policy of risk-spreading in establishing the

manufacturer's duty to the product user under the rapidly expanding principles of strict liability in tort." The court then cited statements from the *Santor* decision which formed the basis of the oft-quoted dicta. *Id.* at 350–51, 431 A.2d 811. Given the policy considerations informing the court's opinion in *Santor* which will be discussed in more detail later in this opinion, as well as the repeated citations of *Santor* in subsequent decisions, the court cannot sustain the summary judgment motion on this basis.

*Statute of Limitations for Santor Cause of Action*

The issue is whether, given the facts alleged in this complaint, the statute of limitations set forth in the Uniform Commercial Code, N.J.S.A. 12A:2–725 applies, or whether the general statute of limitations found at N.J.S.A. 2A:14–1 applies. If the court determines that the general statute of limitations is appropriate, it must then determine whether or not the discovery rule should apply to the facts of this case.

■ Section 2–725 has a four-year statute of limitations and applies to an action for breach of contract of sale. The cause of action accrues at the date of delivery with certain exceptions not applicable to the case at bar. The six-year period of limitations contained in 2A:14–1 may be subject to the discovery rule. For the following reasons, the court holds that the six-year period of 2A:14–1 applies and that the discovery rule may be applicable to this case.

In *Heavner, supra,* the court held that in an action between a purchaser of a product and the party from whom he bought the product, the general statute of limitations rather than the UCC four-year period was appropriate when the action involved personal injury or property damage. 63 N.J. at 154, 157, 305 A.2d 412. In a footnote, the court stated that it does "not reach the question whether N.J.S.A. 12A:2–725 applies to actions merely for loss-of-the-bargain or economic damage in the commercial sense." *Id.* at 157 n. 16, 305 A.2d 512. Defendant USG contends that the Supreme Court of New Jersey would apply section 2–725 to this case. The court cannot agree.

First, it is not entirely clear to the court that this case involves an economic loss situation as opposed to an instance of property damage. In *Glass Sand,* "economic loss" was defined as " 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' " 652 F.2d at 1169 (quotation omitted). The Third Circuit noted that, in accordance with the warranty law underlying contracts, items most frequently sought as damages for such unsuitable products include the reduction in value caused by the defect, costs of repair or replacement, and loss of profits. *Id.*

It is not easy to draw a fine line between property damage and economic loss. "The line that is drawn usually depends on the nature of the defect and the manner in which the damage occurred." *Id.* For example, "[d]efects of quality, evidenced by internal deterioration or breakdown, are assigned to the economic loss category, while the loss stemming from defects that cause accidents 'of violence or collision with external objects' is treated as physical injury," compensable under tort law. *Id.* at 1169–70 (quotation and footnote omitted).

A facial review of this case does not neatly place the action in either category, although it would appear to be more akin to an economic loss situation. The significance of the dichotomy between economic loss and property damage set forth in *Glass Sand* is undercut to some extent by the reliance by the *Glass Sand* court on *Seely v. White Motor Co.,* 63 Cal.2d 9, 403 P.2d 145, 45 Cal.Rptr. 17 (1965). While *Seely* is the seminal case on one side of the issue concerning economic loss and products liability, the Third Circuit has acknowledged that the controlling precedent in this case, *Santor,* is the seminal case on the other side of that issue. 652 F.2d at 1169 n. 12.

A more careful review of the case indicates, nonetheless, that this case may more properly be described as a hybrid of eco-

nomic loss and property damage. The *Glass Sand* court explained that the rationale for the emphasis on accidents in the physical injury situation is that "such situations present a greater safety risk." 652 F.2d at 1170 n. 14. In the instant case, the problem with USG's product is not that it did not perform its function in the ceiling plaster, but rather that it posed a grave risk of personal injury to those in contact with it. Thus, the manufacturer's responsibility to guard against making a product which entails risk of personal harm or property damage, a major concern underlying the doctrine of strict liability in tort, is involved in this case. The case does not primarily involve a problem with the product which mandates its replacement or repair in order to perform its function, or a loss of profit stemming from a defect in the product's performance, but rather the replacement of the product because of a grave personal safety risk.

It is also not entirely clear that the actual damage sustained is only the replacement of the allegedly defective article. The asbestos was only one ingredient of the acoustical plaster sprayed onto the gypsum plaster ceiling. The replacement effort undertaken by the school board did not involve the asbestos ingredient alone, but all the other ingredients making up the outer acoustical plaster. In actuality, then, the defect in the asbestos did not only render the product itself valueless, but also caused the entire ceiling layer consisting of acoustical plaster to be worthless. For these reasons, the loss suffered by plaintiff may technically fall within the ambit of property damage, a conclusion which necessarily entails application of the general statute of limitations. *See Heavner, supra.*

Whether or not the damage sustained may technically fall within the definition of economic loss or property damage is not the real issue, however. The New Jersey courts have not clearly defined what constitutes "economic loss" versus "property damage" in the manner done by the Third Circuit in *Glass Sand* in large part because the New Jersey courts have permitted tort recovery for economic loss. Thus, the definition of economic loss by the New Jersey courts may not be as closely tied to the fitness versus physical injury classifications dichotomizing tort and contract law. Most importantly, regardless of how this action is categorized, this court is convinced that the New Jersey courts would recognize that the policy concerns underlying their application of a tort statute of limitations to property damage and personal injury actions in dangerous product situations apply with equal force to the instant case.

Turning to the *Heavner* footnote first, it is noteworthy that *Heavner* involved a suit by an injured party against the manufacturer of a defective tire and the retailer from whom the tire was purchased. The court rejected the application of the UCC to plaintiff's claim against the manufacturer. In language equally applicable to the instant case, the court stated that section 2–725 "cannot apply to a consumer-user action against a manufacturer for consequential personal injury and property damage." 63 N.J. at 155, 305 A.2d 412. The court determined that 2–725 "could at best only have application where the suit involves two directly contracting parties or where the plaintiff is within the limited third-party beneficiary category permitted by the Code." *Id.* at 155–56, 305 A.2d 412. The court then concluded that the plaintiff's claim against the manufacturer was not controlled by the UCC statute of limitations but by the general statute of limitations found at 2A:14–1. *Id.* at 156, 305 A.2d 412. In the instant case, there is no question but that the parties were not in contractual privity as the asbestos was purchased quite indirectly through a subcontractor.

It was only in addressing the plaintiff's claim against the retailer from whom the plaintiff had directly purchased the tire did the *Heavner* court imply that there may in certain circumstances be a distinction between economic loss claims and other strict liability in tort claims as far as the applicable statute of limitations is concerned. The court held that despite the contractual relationship, the UCC statute of limitations did not apply. The court explained that,

while the plaintiffs would, if New Jersey limitations law were to govern, benefit from the application of N.J.S.A. 12A:2–725, many others would find their causes of action barred before the injuries or damage occurred or were known, by reason of the fact that the four-year period runs from the date of delivery of the defective article. We do not countenance such a result unless legislation unequivocally and absolutely requires it.

*Id.* at 157, 305 A.2d 412 (citations omitted). Only at this point did the court note that it did not reach the question of whether 2–725 applies to actions merely for loss-of-the bargain or economic damage in the *commercial* sense. It appears that the court was concerned with the situation in which the parties have the typical contractual relationship envisioned by the UCC, a situation different than that of the instant case. It is at least interesting that the court noted in that footnote *Seely, supra,* in which *Santor* was expressly not followed. The court found noteworthy the concurring opinion of Justice Peters which would have adopted the *Santor* rationale. The *Heavner* court found "interesting" Justice Peters' suggestion "that the Code should not apply at all in situations involving 'the ordinary consumer,' but should be restricted to dealings between businessmen and merchants." *Id.* at 157 n. 16, 305 A.2d 412. Thus, based on the language of the *Heavner* opinion in light of the circumstances of that case, there does not appear to be any support for USG's position that the New Jersey courts would apply a different statute of limitations in an economic loss products liability suit when the parties did not have a direct contractual relationship.

■ Most importantly, application of the four-year UCC statute of limitations would run directly contrary to the policies underlying the adoption by the New Jersey courts of the *Santor* rationale. The focus in a strict liability suit is upon the product itself, *Michalko v. Cooke Color & Chem. Corp.,* 91 N.J. 386, 394, 451 A.2d 179 (1982) (citations omitted), and not upon the conduct of the defendant. The dangerousness of the product is imputed to the defendant, regardless of whether or not the defendant knew or should have known of the dangerousness of the product. *Beshada v. Johns-Manville Prod. Corp.,* 90 N.J. 191, 198, 447 A.2d 539 (1982). The only issue is whether or not the product distributed by the defendant was reasonably safe. *Id.* Thus, strict liability in tort is product-oriented. *Id.* at 200, 447 A.2d 539. Contract law and the law of warranty, on the other hand, is conduct-oriented. Although the doctrine of strict liability in tort has at times been couched in warranty terms, the warranty to which the courts have referred is not that referred to by the UCC. *Herbstman v. Eastman Kodak Co., supra,* 68 N.J. at 10, 342 A.2d 181.[2] Citing the Restatement (Second) of Torts (1965), the Supreme Court of New Jersey in *Herbstman* noted that the strict products liability rule is not governed by the Uniform Sales Act or the UCC warranty provisions and " 'is not affected by limitations on the scope and content of warranties, or by limitation to "buyer" and "seller" in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act.' " *Id.*

In *Santor,* the court expressly held that the notice provisions of the Sales Act had no application to actions by consumers against manufacturers based upon strict liability in tort. 44 N.J. at 68, 207 A.2d 305. In *Rosenau v. City of New Brunswick,* 51 N.J. 130, 143, 238 A.2d 169 (1968), the court noted that section 2–725 was designed to introduce a uniform period of limitations

---

**2.** In *Herbstman, supra,* at 10, 342 A.2d 181, the Supreme Court of New Jersey noted Prosser's article, "Spectacular Change: Products Liability in General," 36 Cleveland B.A.J. 149, 167–68 (1965), in which he wrote:

'... It has been said over and over again that this warranty—if that is the name for it—is not the old sales warranty covered by the Uniform Sales Act or the Uniform Commercial Code. It is not a warranty of the seller to the buyer at all, but it is something separate and distinct which sounds in tort exclusively, and not at all in contract; which exists apart from any contract between the parties; and which makes for strict liability in tort.'

for "sales contracts" in order to eliminate jurisdictional variations for business concerns operating nationwide. By its terms, section 2–725 relates to actions for breaches of contracts of sale and "presumably was not intended to apply to tort actions between consumers and manufacturers who were never in any commercial relationship or setting." *Id.* In a property damage strict products liability action, the *Rosenau* court noted that the lower court had properly applied the general statute of limitations, but had incorrectly determined that the cause of action had accrued when the defective meter was delivered rather than when the defect manifested itself and the plaintiff had first become aware of the defect. *Id.* at 143–44, 238 A.2d 169. The court stated that the lower court's approach had wholly ignored the tort basis of the claim as formulated in *Santor* "and incongruously served to bar their claim long before it arose and well before" the defective product had actually been installed. *Id.* at 144, 238 A.2d 169.

The Third Circuit has noted that tort law rests upon obligations imposed by law, rather than by the bargain made by the contracting parties. *Glass Sand, supra,* at 1169. "[C]ontract law is largely inapposite to the problem of hazardous defects, because purchasers are not expected to bargain for a safe product—they have a right to such a purchase correlative to the manufacturer's duty to provide" a safe product. *Id.* at 1175.

Application of a contract statute of limitations in a strict liability in tort setting makes little sense given the purpose of strict liability in tort of having the manufacturer bear the risk that the product will turn out to be dangerously defective. Under contract law, the manufacturer could disclaim responsibility for defects under certain circumstances. In addition, there are notice of breach of contract provisions with which a claimant must comply in order to prosecute an action. In *Santor,* as noted earlier, the court held that a notice of defect provision had no application to a strict liability in tort action. 44 N.J. at 68, 207 A.2d 305. The concern of finality underlying the statute of limitations of the UCC is simply inapplicable to a strict liability in tort action. Similarly, there is not present in the strict products liability context the policy permitting parties in a commercial setting to allocate risks in whatever manner they choose.

■ Statute of limitations are essentially equitable in nature. *Lopez v. Swyer,* 62 N.J. 267, 274, 300 A.2d 563 (1973). They are designed to stimulate litigants to prosecute their suits diligently "and 'to spare the courts from litigation of stale claims.'" *Rosenau, supra,* 51 N.J. at 136, 238 A.2d 169, *quoting Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945). Designed to penalize dilatoriness and to serve as measures of repose, 51 N.J. at 136, 238 A.2d 169 (citation omitted), "their whole purpose 'is to apply to persons who have good causes of action which they could, if so disposed, enforce, and to deprive them of the power of enforcing them after they have lain by for the number of years respectively and omitted to enforce them.'" *Id.* at 137, 238 A.2d 169 (quotation omitted).

■ In the strict products liability context, the defects are often unknown at the time the product is delivered. *Santor, supra,* 44 N.J. at 64, 207 A.2d 305. The policy of placing the risk of a latently dangerous product on the manufacturer is to insure that the party who puts the dangerous product in the stream of commerce, rather than the innocent consumer, bears the burden of injury or damage as a result of the danger. *See id.* This policy is designed in part to stimulate manufacturers to undertake increased safety research and to take added precautions to make the product less dangerous. *Beshada, supra,* 90 N.J. at 209, 447 A.2d 539. If the manufacturer is to bear the risk that a product will turn out to be dangerous even if the manufacturer did not know at the time the article left its hands, it makes no sense to impose a harsh statute of limitations in this case based upon the intricacies of the law of sales on a plaintiff who, it is alleged, could not have known of the danger of the defect at the

time the product was delivered. It is precisely this risk that the doctrine of strict liability in tort has placed upon the manufacturer. As the *Santor* court stated, the manufacturer's obligation to provide a safe product "should not depend upon the intricacies of the law of sales." 44 N.J. at 65, 207 A.2d 305.

■ For many of these same reasons, the "discovery" rule should also apply to this type of case. As the Supreme Court of New Jersey has recently remarked, the dangers of asbestos may have been known to the industry as early as the 1930's. *See Beshada, supra*, 90 N.J. at 197, 447 A.2d 539. If, in fact, the plaintiff had no knowledge of the dangerous propensities of the asbestos, regardless of whether or not the defendant had such knowledge, the principles underlying the doctrine of strict liability in tort mandate that the manufacturer who placed the asbestos in the marketplace and who profited thereby bear the cost of damage as long as the plaintiff acted with due diligence in prosecuting the action. The court is aware that the basis for invoking the discovery rule, although stated in plaintiff's brief, is not set forth in the complaint. Rather than dismiss the case on this basis, however, the court will afford plaintiff 20 days from the date of this opinion to amend its complaint in an appropriate manner. Thus, summary judgment will not be granted as to the tort claims based upon the statute of limitations. The warranty claims, however, are clearly barred by the four-year statute of limitations contained in section 2–725.

## Ten-Year Statute of Repose

■ The court is satisfied that the action is not barred by the ten-year statute of repose for actions arising out of defective design of improvements to real property, N.J.S.A. 2A:14–1.1. Enactment of this statute was a legislative response to the discovery rule and the abrogation of the "completed and accepted" rule to tort claims arising from construction of improvements to real estate. *Wayne Twp. Bd. of Educ. v. Strand Century, Inc.*, 172 N.J.Super. 296, 300–01, 411 A.2d 1161 (App.Div.1980), *citing Rosenberg v. North Bergen Twp.*, 61 N.J. 190, 196–97, 293 A.2d 662 (1972).

In *Wayne Twp.*, the court made clear that the statute was intended to reach only those engaged in the design, planning and construction of improvements to real estate. *Id.* 172 N.J.Super. at 302, 411 A.2d 1161. The court noted that the statute "was not intended to benefit manufacturers and sellers of products who were uninvolved in the design, planning and construction of improvements to real estate. Product design alone is not enough to trigger the applicability" of the statute. *Id.*

In *Wayne Twp.* the plaintiff had sued the owner of a subsidiary company which allegedly had participated in the design and manufacture of a dimmer panel used in a school auditorium. The defendant had stipulated that it had designed, manufactured and sold the dimmer panel in question. The Appellate Division noted that the trial court had correctly determined that the dimmer panel was an integral part of the permanent electrical system of the auditorium and was required for the structure to function as intended. *Id.* at 300, 411 A.2d 1161, *citing Brown v. Jersey Central Power & Light Co.*, 163 N.J.Super. 179, 195, 394 A.2d 397 (App.Div.1978), *certif. denied*, 79 N.J. 489, 401 A.2d 244 (1979).

The court stated that if the defendant or its subsidiary participated to any extent in the design and planning of the lighting system used in the auditorium and of the dimmer panel, as fabricated and installed in the school auditorium, the ten-year statute of repose would apply. *Id.* 172 N.J.Super. at 303, 411 A.2d 1161. The court also concluded, however, that if the defendant had "merely sold a stock or shelf item out of its regular inventory or fabricated a product as designed and specified by the electrical engineer or the electrical contractor for this project it was not within the repose of N.J.S.A. 2A:14–1.1." *Id.* The court explained that the legislature did not intend that the statute,

extend repose to the designers and manufacturers of all products or suppliers of

materials which ultimately found their way into improvements to real estate. Implication in the design and planning stage of the improvement to realty itself or of integral component thereof, not mere design of a fungible product or fabrication of a product from specifications which product is later incorporated in the building is required.

*Id.* (footnote omitted).

In a footnote, the court noted *Carter v. Hartenstein,* 248 Ark. 1172, 455 S.W.2d 918 (Sup.Ct.1970), in which the court held that a similar statute of repose applied to a defendant who both manufactured and installed an elevator in an office building. 172 N.J.Super. at 303 n. 3, 411 A.2d 1161. The court also cited as support for its determination *Reeves v. Ille Elec. Co.,* 170 Mont. 104, 551 P.2d 647 (Sup.Ct.1976), in which the court held that the manufacturer of a whirlpool machine installed in the State University field house did not fall within the ambit of the statute of repose. Since in *Wayne Twp.* the record was unclear concerning the extent of the defendant's participation in the design phase of the electrical components, summary judgment was denied. 172 N.J.Super. at 303–04, 411 A.2d 1161.

In the instant case, there is no allegation that USG played any role in the design, planning, supervision or construction of the plaintiff's schools. USG was neither an architect involved in the construction of the schools nor a contractor participating in its construction, the two types of parties the statute was primarily intended to protect. *Rosenberg, supra,* 61 N.J. at 194–95, 197, 293 A.2d 662. Unlike the defendant in *Carter, supra,* USG played no role in the actual installation of the acoustical plaster. The asbestos sold by USG was not designed specifically for use in plaintiff's schools. Rather, it appears to have been mere stock material, available for use in a wide variety of settings, and which incidentally found its way into plaintiff's schools as a result of its use by a subcontractor. The defendant cannot under these circumstances gain the protection of the ten-year statute of repose merely as the result of the fortuity of having the product used as one of many products in the construction of the schools. Accordingly, the motion for summary judgment on this basis is also denied.

*Punitive Damages*

■ Finally, defendant USG contends that punitive damages are not available to a plaintiff in a suit for economic loss. USG may not prevail on this argument. New Jersey permits recovery of exemplary damages under certain circumstances in contract actions, and clearly permits recovery in the strict products liability context. Given the punitive and deterrent policies underlying the concept of exemplary damages in New Jersey, *see Sandler v. Lawn-A Mat Chem. & Equip. Corp.,* 141 N.J.Super. 437, 358 A.2d 805 (App.Div.1976), there is no policy basis for denying an award of punitive damages in an economic loss products liability suit if the plaintiff can establish the requisite egregious conduct on the part of the defendant.

In sum, defendant USG's motion for summary judgment is granted as to the warranty claims. In all other respects, the motion is denied. The court will enter an appropriate form of order.