**ASTRIUM, S.A.S.; and Astrium, Ltd., Plaintiffs,**

v.

**TRW, INC.; Pilkington Optronics, Inc.; Corning Netoptix; OFC Corporation; and Optical Filter Corporation, Defendants.**

No. SACV001169DOCMLGX.

United States District Court, C.D. California.

Feb. 25, 2003.

Robert G. Barnes, Julian Brew, George T. Caplan, Laurie E. Smith, Christopher S. Reeder, Kaye Scholer, Los Angeles, CA, Randall L. Speck, Kaye Scholer, Washington, DC, Glenn Pogust, Jeffrey A. Fuisz, Kaye Scholer, New York City, Roya P. Cohen, Kaye Scholer, Los Angeles, CA, for Plaintiffs.

Fred Gilbert Bennett, William C. Price, Robert J. Becher, Quinn Emanuel Urquhart Oliver & Hedges, James W. Hunt, Garth W. Aubert, Suzanne N. McNulty, Mendes & Mount, Los Angeles, CA, Steve Y. Koh, Perkins Coie, John D. Dillow, Perkins Coie, Seattle, WA, Ronald A. McIntire, Judith B. Gitterman, Perkins Coie, Santa Monica, CA, John D. Dillow, Ronald A. McIntire, Perkins Coie, Seattle, WA, Frank A. Silane, Kevin R. Sutherland, Samatha F. Spector, Condon & Forsyth, Los Angeles, CA, Diane Wilson, Judith R. Nemsick, Robert A. Carruba, Condon & Forsyth, New York City, James W. Hunt,

Garth W. Aubert, Suzanne N. McNulty, Mendes & Mount, Los Angeles, CA, Judith R. Nemsick, Robert A. Carruba, Condon & Forsyth, New York City, for Defendants.

## ORDER GRANTING DEFENDANTS' TRW, CORNING NETOPTIX, OFC CORPORATION, AND OPTICAL FILTER CORPORATION'S MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFFS' FRAUD CLAIMS, BASED ON RECONSIDERATION OF THIS COURT'S SEPTEMBER 23, 2002 ORDER.

CARTER, District Judge.

Before the Court is Defendant TRW's motion for partial reconsideration and Defendants Corning Netoptix, OFC Corporation, and Optical Filter Corporation's motion for partial reconsideration of the Court's September 23, 2002 Order.[1] In its September 23 Order, the Court denied Defendants' motions for summary judgment on Plaintiff Astrium's fraud claims. Based on a recent change in law, Defendants ask the Court to reverse its holding, thereby granting the motions for summary judgment on Astrium's fraud claims. The motion is based on the recent decision of the California Court of Appeals, titled *Robinson Helicopter Co., Inc. v. Dana Corp.*, 105 Cal.App.4th 749, 129 Cal.Rptr.2d 682 (2003). After careful consideration of the moving, opposing, and replying papers, oral argument on February 24, 2003, and for the reasons set forth below, the Court GRANTS Defendants' motions.

As a preliminary matter, Astrium requests this Court take judicial notice of the full briefs before the California Court of

---

1. Defendant Pilkington Optronics, Inc. also brought a motion for partial reconsideration of the Court's September 23 Order. Four days prior to the hearing on this matter, Astrium and Pilkington reached a settlement agreement resolving all the claims by Astrium

against Pilkington. The settlement is conditioned upon the Court's determination that the settlement is made in "good faith." Pilkington's motion for reconsideration shall be stayed by the Court until that time.

Appeals in the *Robinson* case. A Court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R.Evid. 201. The Court may take judicial notice of the documents, as they are public record. However, the Court bases this Order only on the published decision in *Robinson*, as that is the best and final reasoning employed by the Court of Appeals.

## I. BACKGROUND

### A. Factual Background

#### 1. *General Facts*

Plaintiffs Astrium, S.A.S. and Astrium Ltd. (collectively Astrium) design, plan, and construct satellites used to perform telecommunication functions for Astrium customers. The satellites receive and amplify signals through the use of multiple on-board transponders and they derive their electrical power by collecting sunlight and converting it into electricity. Nine specific satellites are involved in this litigation, all containing solar arrays for converting sunlight into electricity. Solar arrays are made up of panels of interconnected solar cell assemblies (SCAs), which are the focus of the litigation. SCAs contain numerous layered components: (1) a reflective backing; (2) a photovoltaic or solar cell; (3) adhesive; (4) a coverglass; and (5) an anti-reflective, anti-ultraviolet (UVR) thin-film coating used to enhance the performance and operating life of the solar arrays.

Astrium contracted with Third–Party Defendant Fokker Space B.V. (Fokker) to provide the solar arrays for the satellites. Fokker in turn contracted with Defendant TRW, Inc. (TRW) to provide the SCAs. TRW subcontracted with Defendant Pilkington Optronics Inc. (Pilkington) for production of the coverglasses used in the SCAs. Pilkington contracted with Defendant OFC [2] for the thin-film UVR coating on the coverglasses used in the SCAs.

OFC received uncoated coverglasses from Pilkington and applied the UVR coating to the uncoated coverglasses. The UVR coatings are applied using an evaporative process in one of OFC's four vacuum chambers. OFC then shipped the coverglasses to TRW and TRW glued the coverglasses to the cells to complete the SCAs.[3] OFC applied the coatings pursuant to a written contract with Pilkington and based upon written specifications for the Astrium satellites that it received from Pilkington. For each shipment of coverglasses, OFC provided a written certificate of compliance to Pilkington that the coverglasses complied with the Pilkington purchase order and all the requirements and specifications.

Sometime prior to 1999, Astrium launched four satellites, HotBird 4, Hot-Bird 5, ST–1, and WordStar 1 (Launched Satellites). In December 1998 or early 1999, telemetry data from these satellites, that contained the OFC-applied UVR coatings on the coverglasses, indicated that the power generated by the solar arrays was decreasing abnormally. In March 1999, Astrium began an investigation to determine the source of the power loss. Astrium concluded that defectively-coated coverglasses supplied by TRW, Pilkington, and OFC caused the power loss anomaly. According to Astrium, OFC's UVR coat-

---

**2.** OFC includes Defendants Corning Netoptix, Inc., OFC Corporation and/or Optical Filter Corporation and their predecessors.

**3.** TRW shipped the completed SCAs to Fokker in Holland who then supplied the solar arrays to Astrium.

ings were abnormally porous and, therefore, highly susceptible to contamination that could not be removed through a simple cleaning. The contaminated coverglasses (or at least the contaminated coating on the coverglasses) darkened when exposed to UV radiation in space, thereby blocking sunlight and preventing the solar cells, and thus the solar arrays, from converting sunlight into electricity and generating the power needed for satellite performance. For purposes of this motion, Defendants do not contest these factual statements.

The five remaining satellites, K–TV, WorldStar2, WordStar 3, ASTRA 2–B, and SKYNET 4F, were not launched with the defective solar arrays. In fact, in October 1999, Astrium concluded that coatings applied to coverglasses installed on the K–TV satellite were free of defects. According to Astrium, this is because OFC, Pilkington and TRW, discovered the defect in the coating mid-way through completing Astrium's order. OFC then modified the temperature in its vacuum chamber and the coatings applied after this modification are defect-free. Thus, not all of the nine satellites contain the defective coating.

### 2. Astrium's fraud claims

Astrium's fraud claims are premised upon allegations that Defendants made false representations to Astrium regarding the coating on the coverglasses. First, Astrium claims that OFC applied the coating to the wrong side of the coverglasses and that OFC and Pilkington knew of the mistake. According to Astrium, Defendants failed to disclose the problem despite express questions from Astrium regarding the coating's compliance with specifications. Astrium suggests that coating placed on the wrong side of the coverglasses affects telemetry data and if Astrium had known the extent of the problem earlier, damages could have been mitigated. Second, Astrium contends that OFC and Pilkington told Astrium that the UVR

coating had been qualified by Lockheed. According to Astrium, the coating was not qualified by complete testing. Instead, Lockheed referred back to testing results from prior OFC coating samples to qualify the coating later used for the Astrium satellites and did not do specific UV radiation testing.

Astrium separates these alleged misrepresentations into two time periods. The first is pre–1999, during the period of production and acceptance of the coverglasses. Astrium contends that it never would have accepted the solar arrays containing the defective coverglasses or continued to request additional satellites if it had known of the orientation and qualification problems.

The second time period is during 1999, after Astrium discovered the power loss anomaly. In 1999, Astrium aggressively sought the cause of the problem, embarking on an extensive investigation. Astrium repeatedly questioned Defendants regarding the coverglasses and the possible causes of the power loss anomaly. Astrium contends that Defendants' misrepresentations during this period caused significant damages, independent from those associated with the defective coating. If Defendants had been truthful about the coating and qualification, Astrium could have avoid contractual losses and investigative costs. For example, the launch of the K–TV satellite was delayed, with severe monetary consequences, because Astrium was not sure if that satellite also contained the defect found in the Launched Satellites. The K–TV satellite contains no coverglass coating defect. If Defendants had truthfully disclosed the coating and qualification information, Astrium could have cleared the satellite for launch and greatly mitigated its damages.

## B. Procedural Background and Prior Rulings

In July 2001, Astrium filed a First Amended Complaint, alleging negligence, fraud, and negligent misrepresentation. The first cause of action for negligence was brought against all three defendants, TRW, Pilkington and OFC. The remaining two causes of action, for fraud and negligent misrepresentation, were alleged solely against TRW. OFC moved for summary judgment, claiming that California's economic loss rule precludes Astrium's negligence claims. After OFC's motion was filed, Astrium filed a motion to modify the scheduling conference order and for leave to file a Second Amended Complaint (SAC). Subsequently, TRW and Pilkington filed similar motions for summary judgment on the negligence claims. Despite the pendency of the motions for summary judgment, the Court found that there was good cause to modify the scheduling order and granted Astrium's motion. (Order Granting Mot. to Modify Scheduling Order.) Thus, the SAC is now the operative complaint in this action.

On April 23, 2002, the Court ruled on the motions for summary judgment, granting judgment for Defendants as to the negligence causes of action. The Court found that the "physical effect of the defective coating is limited to the coating" and, thus, Astrium failed to show "physical damage to any property other than the defective component itself." (April 23 Summ. J. Order at 9, 18.) Additionally, under the SAC, "Astrium's claims are largely, if not solely, for economic losses." (*Id.* at 11.) Therefore, "Astrium's negligence claim fits squarely within [ ] California cases applying the economic loss rule to bar tort actions." (*Id.* at 18.) Citing the policy underlying California's economic loss rule, the Court concluded: "Astrium can, and should, 'be fairly charged with the risk that the product will not match [its] economic expectations unless the manufacturer agrees that it will.'" (*Id.* at 23 (citations omitted).)

On September 23, 2002, the Court again ruled on motions for summary judgment. Defendants argued that, as a matter of law, Astrium's causes of action for fraud and negligent misrepresentation were barred based on the economic loss rule. The Court granted Defendants' motion as to the negligent misrepresentation claims, but denied the motion as to the fraud claims. With a paucity of California cases grappling with the application of the economic loss rule to fraud, the Court turned to a recent California Supreme Court case that applied the rule to negligence claims. In *Aas v. Superior Court*, 24 Cal.4th 627, 101 Cal.Rptr.2d 718, 727, 12 P.3d 1125 (2000), the court distinguished negligence from fraud, leading the Court to believe *Aas* intended to exclude fraud claims from the scope of the economic loss rule. The Court determined that policy considerations and the principles underlying the economic loss rule also counseled against application to fraud claims, including the conclusion that application would effectively insulate any intentionally tortious conduct that occurred in the commercial context. In light of this analysis, the Court found it "reasonable to presume that California's economic loss rule does not bar fraud claims for economic damages." (Sep. 23 Summ. J. Order at 8.) Further, the Court cautioned that if applied the economic loss rule to fraud claims, "absent any clear authority from the state courts, it would be extending the judicially-created doctrine to a new area. It is not a federal district court's prerogative to so extend a state common law rule." (*Id.* at 11.) Without clear guidance from the California Supreme Court, the Court determined that the economic loss rule did not bar Astrium's fraud claims.

On October 7, 2002, the Court granted the OFC Defendants' motion for summary judgment on Astrium's breach of warranty claim. The Court found that Astrium did not rely on the OFC warranty, which came into existence years after Astrium contracted to purchase solar arrays from Fokker, was part of the basis of Astrium's bargain with Fokker.

## II. LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, the existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; to defeat the motion, the non-moving party must affirmatively set forth facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Id.* at 256, 106 S.Ct. at 2514. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence of a genuine issue of material fact from the non-moving party. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). The moving party need not disprove the other party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

## III. DISCUSSION

### A. Factual basis of *Robinson Helicopter*

The narrow question presented in this motion is whether the January 24, 2003 decision of the California Court of Appeal in *Robinson Helicopter* precludes Plaintiff's fraud claim against Defendants as a matter of law.

In *Robinson Helicopter,* Dana Corporation (Dana) manufactured and sold helicopter sprag clutches to Robinson Helicopter Company (Robinson), who used the clutches in its R22 and R44 helicopters. *Id.* at 685. According to the Federal Aviation Administration (FAA) type certificate issued to Dana, the parts of the clutches were required to be ground to a particular level of hardness—"50/55 Rockwell." *Id.* at 686.

Dana changed its grinding process to "61/63 Rockwell" in 1996 without notifying either Robinson or the FAA. *Id.* at 686. Despite the change, Dana continued to provide certificates attesting that the clutches were manufactured in conformity with Robinson's written specifications. *Id.* In 1997, Dana changed its process back to

the 50/55 Rockwell hardness, again without notifying either Robinson or the FAA. *Id.* at 686.

Shortly thereafter, Robinson began experiencing significantly higher failure rates with the 61/63 Rockwell hardness level clutches. *Id.* at 686. Upon examination, Robinson discovered that the clutches were ground to the higher 61/63 level of hardness. *Id.* On November 30, 1998, Dana disclosed for the first time that it had used the 61/63 Rockwell hardness level in its manufacturing process. *Id.* Although Robinson repeatedly stressed to Dana the importance of replacing the clutches as soon as possible before an accident might occur, Dana did not provide Robinson with the necessary serial number information until February 12, 1999. *Id.* at 687. Dana also refused to replace the clutches, claiming it was Robinson's own inadequate helicopter designs that caused the clutches to fail. *Id.* at 687.

Robinson filed suit for breach of contract, breach of warranty, and negligent and intentional misrepresentations. *Id.* at 687. A jury awarded Robinson $1,533,924.00 in compensatory damages. *Id.* at 688. The jury also found that Dana had made false misrepresentations of fact and had knowingly misrepresented or concealed material facts with the intent to defraud, and awarded $6 million in punitive damages. *Id.*

The appellate court overturned the punitive damages award. *Id.* at 698–99. The court examined the economic loss rule, recognizing that "no California court has yet addressed the question whether such rule should also bar a tort recovery for *intentional* misrepresentation or fraud." *Id.* at 694. After conducting an extensive review of the rule, California economic loss cases, decisions in other jurisdictions, and public policy, the *Robinson* court held that the economic loss rule also applied to fraud claims where the fraud was committed in

the performance, as opposed to the inducement, of a product sales contract, and where the defective product caused only economic loss. *Id.* at 684. According to the court, Robinson had no independent tort action and no viable claim for fraud because Robinson had not established any fraudulent representation or concealment that was not intertwined with Dana's performance of its contract and warranty breaches. *Id.* at 698–99.

## B. Application of *Robinson Helicopter*

■■■ Defendants move for summary judgment on Astrium's fraud claim, arguing that, based on *Robinson,* the economic loss rule bars the fraud claims as a matter of law. The economic loss rule "precludes a recovery in tort where the sale of a defective product has resulted in no property damage or bodily injury, but only economic loss to the buyer of that product." *Id.* at 684.; *see generally Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P.2d 145 (1965). The policy concerns underlying the rule distinguish recovery in contract and tort. A manufacturer "cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." *Seely,* 45 Cal. Rptr. at 23, 403 P.2d 145. Although a consumer should not bear the risk of physical injury when he buys a product in the market, he can "be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." *Id.* After an extensive review of cases in other jurisdictions and policy analysis, the *Robinson* court concluded that, "in actions arising from the sale or purchase of a defective product, a plaintiff seeking to recover in tort rather than in contract must be able to demonstrate that its eco-

nomic losses were accompanied by either (1) physical damage to property other than the defective product itself ("other property"), or (2) bodily injury." *Robinson,* at 693.

■ Like in *Robinson,* Astrium's fraud claims are based on misrepresentations that are inextricably intertwined with Defendants' contractual duties. Defendants' duties to Astrium were to provide solar arrays that complied with the Certificates of Conformance. The specifications required Defendants to notify Astrium of changes in the manufacturing, assembly, testing, or inspection process. They also required notification of defects in items that Astrium had already accepted. Astrium alleges it incurred damages because Defendants made certain changes in the manufacturing process, and those changes ultimately caused the low power anomaly, which is the basis for this litigation. Essentially, Astrium's fraud claims relate to *how* Defendants breached their contractual duties toward Astrium. *Robinson,* however, makes clear that contract law does not inquire into the breaching parties' motives.

The court in *Robinson* stated, "the law generally does not distinguish between good and bad motives for breaching the contract. In traditional contract law, the motive of the breaching party generally has no bearing on the scope of damages that the injured party may recover for the breach ... The imposition of tort remedies for "bad" breaches of commercial contracts is a substantial deviation from the traditional approach which was blind to the motive for the breach." *Id.* at 698–99 (citations omitted). Consequently, conduct amounting to a breach, whether fueled by "bad" or "good" motives, does not give rise to tort claims unless the tortious conduct violates an independent duty arising from tort law principles. *Id.* at 698. Here, as in *Robinson,* Defendants' misrepresentations related entirely to the performance of the contract, and were not extraneous to the contractual dispute. As such, the economic loss rule bars the fraud claims.

Further, Astrium has not demonstrated that its economic losses were accompanied by either damage to other property or bodily injury. Astrium does not allege that the defective solar arrays caused damage to the rest of the satellites. Astrium's damages result from the defective solar arrays themselves, and consequential damages and lost profits flowing therefrom. Therefore, Astrium's fraud claims do not fit into the exceptions the *Robinson* court set forth.

Astrium contends *Robinson* is inapplicable for a number of reasons. Astrium argues that *Robinson* does not apply because (1) Astrium was not in privity of contract with the Defendants; (2) Astrium was fraudulently induced to buy the solar arrays and launch defective satellites; (3) the post-sale fraud caused Astrium increased damages. These arguments are not persuasive.

*First,* Astrium contends *Robinson* is inapplicable because Astrium had no contract with any of the Defendants. Therefore, Astrium's method of recovery against Defendants should lie in tort. Astrium argues that Defendants owe a legal duty to tell Astrium the truth, and this duty arises under operation of law, not contract. Cal. Civ.Code § 1709. Essentially, Astrium argues that *Robinson* only applies to parties who are in contractual privity with one another.

*Robinson 's* holding is not so narrow. The court never states that its' holding depends on the parties being in contractual privity. Moreover, cases relied upon by *Robinson* have applied the economic loss rule regardless of whether the plaintiff and defendant were in privity of contract. *See Aas,* 24 Cal.4th 627, 101 Cal.Rptr.2d 718, 12 P.3d 1125 (barring plaintiffs' tort claims

based on the economic loss rule where there was no privity of contract); *Seely*, 45 Cal.Rptr. at 19, 403 P.2d 145 (applying the economic loss rule in an action between a truck purchaser and truck manufacturer, where they were not in privity of contract); *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3rd Cir.2002) (applying the economic loss rule to warranty and fraud claims, where no breach of contract claim was alleged); *Cooper Power Sys. v. Union Carbide Chemicals & Plastics Co.*, 123 F.3d 675, 681 (7th Cir.1997) (finding that "privity of contract is not an element of the economic loss doctrine").

The reasoning employed by *Robinson* bolsters this finding. The court defines the economic loss rule as one which "precludes a recovery in tort where the sale of a defective product has resulted in no property damage or bodily injury, but only economic loss to the buyer of that product." *Robinson*, at 684. Indeed, the economic loss rule has consistently been applied to claims brought by purchasers of goods who are not in privity of contract with the goods' manufacturer, because those purchasers still have contract-based claims for breach of warranty and strict product liability.

Absent privity of contract, consumers of defective products may still recover in actions for breach of express and implied warranty. Astrium contends that because this Court granted OFC's motion for summary judgment against Astrium on its breach of warranty claims, it will not be unable to recover against Defendants. However, the *Robinson* case cannot turn on whether a plaintiff actually does recover on warranty claims. That Astrium's warranty claims failed is inconsequential to determining whether *Robinson* applies.

Further, Astrium's logic would impose different standards of liability upon Fokker, with whom Astrium entered into a contract, and the subcontracting Defendants.

Under the standard Astrium urges, the economic loss rule would bar tort claims as to Fokker, but not as to Defendants. Astrium could therefore recover punitive damages from Defendants, but not Fokker, even if all parties engaged in the exact same conduct. Such an inconsistent standard would result in a disincentive to enter into contracts.

Astrium contends that the terms of the Fokker/Astrium contract could not have shielded Astrium from any fraud by Defendants. While the contract with Fokker could not possibly have accounted for all possible contingencies, the *Robinson* court addresses that problem. When the fraud is inextricably intertwined with the breach of contract, the plaintiff may recover all its contract damages. But where the fraud results in other property damage, or bodily injury, the plaintiff may still recover in tort. Also, a plaintiff may still recover in tort where the plaintiff was fraudulently induced to enter the contract. These exceptions address Astrium's concerns. However, the exceptions do not apply in this case. Astrium's damages were subsumed in its contract claims against Fokker.

*Second*, Astrium argues that its claims fall into the exceptions the *Robinson* case carved out for fraud in the inducement. Astrium contends *Robinson* does not apply because Defendants' misrepresentations fraudulently induced Astrium to buy solar arrays with OFC coatings.

*Robinson* held that the economic loss rule applies to "intentional fraud cases where such fraud has been committed in the performance, as opposed to the inducement, of the product sales contract." *Id.* at 684. In so holding, the court found the reasoning of *Huron Tool & Engineering Co. v. Precision Consulting Services*, 209 Mich.App. 365, 532 N.W.2d 541 (1995) compelling. In explaining the distinction

between fraudulent inducement and other forms of fraud, the *Huron* court stated:

> "Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods."

*Robinson,* at *694–95 (quoting *Huron,* 532 N.W.2d at 545).

The distinction between fraud in the inducement and fraud in the performance therefore rests on the fact that in the first situation, the parties cannot negotiate freely. A plaintiff in that situation should not be limited to contract damages, because the plaintiff did not make a fully informed choice to enter into the contract. Astrium does not allege that it was induced to enter into the contract. Rather, Astrium contends the Defendants' fraud induced Astrium to accept the solar arrays when it otherwise would not have accepted them. However, this argument could be made for every breach of contract—purchasers rarely knowingly accept non-conforming goods. When the purchaser discovers the goods do not conform, contract law provides proper remedies. *Robinson* clearly distinguishes this situation, where the purchaser freely enters into a contract and later accepts non-conforming goods, from the situation where the plaintiff was fraudulently induced to enter into the contract in the first place.

Further, Astrium has not pled fraud in the inducement. Pursuant to Federal Rule of Civil Procedure 9(b), fraud must be pled with particularity. Astrium alleges that Defendants' misrepresentations caused Astrium to accept the solar arrays, use the solar arrays in its satellites, deliver those satellites to its customers, launch the satellites, and incur delay expenses in discovering the defects in the satellites. (SAC ¶¶ 152, 171.) Astrium has not alleged that it was fraudulently induced to enter into the contract in the first place.

*Third,* Astrium contends that *Robinson* does not apply because Astrium has sued based on Defendants' representations which caused further damages beyond the breach of the contract. Astrium seizes on the following language in *Robinson:*

> "Dana's failure, prior to November 30, 1998, to advise Robinson that it had altered a manufacturing process, plus its repeated certifications that the clutch sprags were manufactured in accordance with the established design and specifications, may have induced Robinson to continue to purchase and install the clutches in its helicopters, but such 'reliance' by Robinson did not result in any detriment to it beyond the damages already covered by the contract and warranty breach claims." With respect to Dana's failure to disclose the requested information regarding the clutch serial numbers following the November 30, 1998 disclosure of the July 1996—October 1997 alteration in the manufacturing process, we do not see how the delay in disclosing the specific serial numbers adversely impacted Robinson.

*Robinson,* at 699. In comparison, Defendants' alleged misrepresentations caused Astrium massive delay penalties while Astrium tried to determine the cause of the power loss anomaly and whether it affected satellites awaiting launch. Astrium was unable to clear the K–TV satellite for launch in time to avoid contract termination. Astrium contends that, unlike in

*Robinson,* it was adversely impacted by Defendants' failure to disclose the earlier misrepresentations.

*Robinson*'s discussion of "adverse impact" appears to be additional support for the court's ultimate holding, rather than part of the test for determining whether the economic loss rule applies. In the pre-November 30, 1998 period, the court discusses how Robinson's reliance did not produce damages *beyond those covered by the contract and warranty claims.* In the 1999 period, Astrium may have incurred additional damages, but those damages are recoverable under a contract or warranty theory. Also, the *Robinson* court's emphasis on language in *Werwinski* is telling. The court states that since *"the alleged fraudulent concealment did not cause any harm to the plaintiffs distinct from those caused by the breach of contract; and the mere fact that disclosure of certain facts to plaintiffs may have allowed them to take corrective action does not change the result,* in other words, *it did not create any right to sue for fraud." Id.* at 695–96 (quoting *Werwinski,* 286 F.3d at 678) (emphasis in original) (internal citations omitted). The crucial issue is that the alleged fraudulent statements relate to the quality and character of the goods and are so intertwined with the performance of the contract that they create no harm distinct from the contractual claims.

The Court does not read *Robinson* to carve out an exception to the rule where the fraudulent statements created consequential damages beyond the damaged goods themselves. Contract law permits recovery for "all the detriment proximately caused [from the breach], or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ.Code § 3300 (2003). Indeed, *Robinson* recognized that claims for "purely economic loss" may include lost profits, consequential damages, loss of expected proceeds, lost opportunities, costs of repair and re-

placement, loss of use, and loss of good will. *Id.* at 689 (citing *North American Chemical Co. v. Superior Court,* 59 Cal. App.4th 764, 777 n. 8, 69 Cal.Rptr.2d 466 (1997)). Here, as in *Robinson,* all of Astrium's damages were recoverable under contract or warranty theories. The damages caused by launch delays and loss of the K–TV contract are consequential damages of the non-conforming solar arrays. Indeed, Astrium pled those same damages in its breach of warranty claim against OFC. (SAC ¶¶ 143, 144.)

Finally, in its brief and during oral argument, Astrium strenuously argues that *Robinson* is contrary to controlling California Supreme Court authority and public policy. Astrium urged the Court to essentially ignore *Robinson* because it conflicts with California Supreme Court authority in *Aas.* Robinson, however, does not conflict with *Aas. Aas* did not directly address whether the economic loss rule applied to fraud. Until *Robinson,* "no California court ha[d] yet addressed the question whether [the economic loss rule] should also bar a tort recovery for *intentional* misrepresentation or fraud." *Robinson,* at 694. While this federal district court is bound by pronouncements of the California Supreme Court, if the California Supreme Court has not spoken directly on the issue, we then look to decisions of the California Courts of Appeal. *Ortland v. County of Tehama,* 939 F.Supp. 1465, 1468 (E.D.Cal.1996) (citing *Scandinavian Airlines System v. United Aircraft Corp.,* 601 F.2d 425, 427 (9th Cir.1979)). "Thus, in the absence of other evidence, state Courts of Appeal decisions cannot be ignored." *Id.* Astrium urges this Court to follow its September 23 Order. However, this Court did not have the benefit of clear California authority at that time. The ruling in *Robinson* now mandates a different decision.

Astrium contends that public policy mandates distinguishing between inten-

tional breaches of contract and fraud during the breach. *Robinson*, however, sets forth the reasons why that should not be the case. As already discussed, the traditional contract approach is "blind to the motive for the breach." *Harris v. Atlantic Richfield Co.*, 14 Cal.App.4th 70, 17 Cal. Rptr.2d 649, 656–57 (1993). By allowing plaintiffs to bring fraud claims for every "bad" breach of contract, courts run the risk that "contract law would drown in a sea of tort." *Robinson*, at 696 (citations omitted).

Astrium also contends that the vast majority of other jurisdictions have recognized that the economic loss rule does not apply to fraud. Interestingly, the *Werwinski* court noted the "emerging trend" in other jurisdictions recognizing only a limited exception to the economic loss doctrine for fraud claims that arise independently of the underlying contract. *Werwinski*, 286 F.3d at 676. In any event, it is not for a federal district court to stray from California law merely because other jurisdictions have decided differently. The *Robinson* court conducted a thorough, well-reasoned survey of guidance from other jurisdictions, as well as public policy, and concluded that the economic loss rule applies to intentional fraud claims. This Court is bound to follow that holding, regardless of different decisions in other jurisdictions.

## IV. DISPOSITION

For the reasons set forth above, the Court GRANTS Defendants TRW, Inc., Corning Netoptix, OFC Corporation, and Optical Filter Corporation's motions for summary judgment on Astrium's fraud claims.

IT IS SO ORDERED.