GRIFFIS, J.,
dissenting:
¶ 31. I respectfully dissent. The facts of this case present an unusual and intriguing scenario. In my opinion, the Mississippi Supreme Court decision in In re Estate of Reid; Cupit v. Pluskat, 825 So.2d 1 (Miss.2002), controls the outcome of this case and requires that we reverse and remand this case for further proceedings.
¶ 32. I would reverse the chancellor’s judgment to deny Illinois Central Railroad Company’s leave to intervene. I would remand for the chancellor to grant Illinois Central leave to file its complaint and to conduct an evidentiary hearing on the claims asserted in the complaint.
¶ 33. On October 25, 2005, John Foster, Jr. filed an amended complaint in a personal injury case pending against Illinois Central. The case was pending in the Circuit Court of Warren County, Mississippi. The case sought damages for personal injuries, under the Federal Employers Liability Act, as a result of alleged occupational exposure to asbestosis while Foster was employed by Illinois Central.
¶ 34. On February 21, 2006, Foster filed sworn interrogatory responses affirming that he had previously filed an identical lawsuit in the Circuit Court of Jefferson County, Mississippi. In the interrogatory responses, Foster stated that his only dependents were his wife, S.C., and one dependent child, S.F.
¶ 35. On June 26, 2006, Foster and his adult daughter, Virginia Smith, filed a pe *1014 tition for adoption. Virginia is the natural mother of the children that are the subject of this case. Foster is their natural grandfather. The petition stated:
The petitioner herein [Foster] who seeks adoption of the minor children herein would show unto the Court that he is a fit, suitable and proper person to adopt the said child. The party proposes to rear, train and educate the said minor children and to give such children all rights as if the said children had been born to the said petitioner, including the right of inheritance from him.
Foster signed an affidavit, which was attached to the petition, that “acknowledged that he signed and delivered the above and foregoing Petition for Adoption.” Foster did not state that the petition was true and correct. Foster was dying of cancer. Thus, based on his physician’s records, Foster was most likely not a “fit, suitable” person and was not in a position to “rear” the children.[5]
¶ 36. The children’s natural parents, Virginia and Dennis Smith, individually signed separate consents to adoption and release of their parental claim. Their consents made two significant statements. First, in each consent, the children’s natural parents stated: “I further waive all rights to the custody and control of said children and relinquish any parental right which I may have in connection with said children.... ” Second, they stated: “[I] do so freely and voluntarily and understand that this Consent and Release of Parental Claim is irrevocable and agree that I will not interfere with the custody of said child and hereby waive all rights.” In essence, the natural parents were willing to give up their parental rights and give custody of their children to a man with a terminal illness.
¶ 37. Two days later, on June 28, 2006, the decree of adoption was signed by the chancellor. The decree of adoption states, “[t]hat the natural father, [Dennis], has appeared herein and has consented to the adoption prayed for in said petition, all as authorized by a sworn written consent, executed by the father of the minor children.” (Emphasis added). It is not clear who actually appeared before the chancellor to get the decree signed and what information the chancellor had other than the petition and the proposed decree. However, the decree does not mention that Foster or Virginia “appeared herein,” but it seems to indicate that Dennis, the children’s natural father, may have appeared in court with counsel on the day the decree was signed. There is nothing in the record to indicate that counsel for the parties or the parties themselves informed the chancellor of Foster’s medical condition at the time of the adoption.[6] There is no record of the proceedings held before the chancellor.
¶ 38. On August 7, 2006, Foster died. His death certificate indicated that his death was “due to or as a consequence of *1015 chronic'lung cancer.” In his obituary, the adopted children were not referred to as Foster’s children. Rather, they were listed as “special grandchildren.”
¶ 39. On June 26, 2007, Illinois Central filed a motion for leave to intervene in the adoption matter. The proposed intervening complaint to declare adoption null and void claimed:
According to the records of Dr. Jack Rodriguez, as early as June of 2005 Mr. [Foster] was 74 years old and came to the doctor following a 40 pound weight loss and poor appetite. [Foster] had been previously diagnosed with lung cancer and had a long history of chronic obstructive pulmonary disease. Additionally, [Foster] had shortness of breath on exertion, a clear dry cough, and constipation. [Foster] was using oxygen by nasal cannula. Dr. Rodriguez’s office chart indicates that [Foster] had refused chemotherapy or radiation and wanted only comfort measures.
Again in July 2005, Dr. Rodriguez’s office note indicates that [Foster] had refused any further staging, chemotherapy or radiation and that he would be agreeable to [h]ospice care. Dr. Rodriguez’s note on both dates indicates that [V.S], his daughter, and biological mother of the three children [Foster] adopted in this cause and the joint petitioner in the adoption, was present at both visits. Reports from the Cancer Care and Diagnostic Center of Natchez in December, 2005 and January, 2006 indicate that the cancer mass was progressing with “metastatic lesions throughout the lung field.” [Foster] continued to decline chemotherapy treatments and continued the use of oxygen.
Six months after this medical treatment, Foster and Virginia filed the petition for court’s authority to allow Foster to adopt the children.
¶ 40. On January 25, 2008, the chancellor denied Illinois Central’s motion to intervene. No record of this hearing was provided to this Court. A record of the evidence presented or the arguments made by counsel at this hearing would have been helpful to this Court’s review.
¶ 41. The majority concludes that: Illinois Central has no right to intervene because it only asserts a purely economic interest; Illinois Central is not a parent of the children and has no statutory right of intervention; and Illinois Central did not file its motion within the six-month time limitation imposed by Mississippi Code Annotated sections 93-17-15 (Rev.2004) and 93-17-17 (Rev.2004). The majority attempts to distinguish Pluskat. I believe this case is directly on point and controls the outcome of this case.
¶42. In Pluskat, the supreme court held that the adoption in question could be subject to collateral attack by the natural heirs due to the unusual circumstances surrounding a will contest. Pluskat, 825 So.2d at 8(¶ 30). Michael Cupit was a twenty-four year old law student who approached Mary Lea Reid, a seventy-eight-year-old widow. Id. at 3(¶ 3). Cupit professed an academic interest in the architecture and history of Reid’s antebellum home. Id. Over the next few years, Cupit and Reid developed an intimate relationship that shocked Reid’s neighbors, friends, and family. Id. at (¶ 4). Cupit eventually assisted Reid in first drafting a will that devised her real property to him; then he assisted her in drafting a deed that conveyed the real property to him. Id. at 3-4(¶ 5). Several years later, Reid adopted Cupit, thus making him her sole heir under intestate succession. Id. at 4(¶ 8).
¶ 43. After Reid died, a potential heir, Thomas Pluskat, commenced a probate *1016 proceeding in chancery court. Pluskat asked the chancellor to set aside Reid’s will, her adoption of Cupit, and the warranty deed that conveyed her property to Cupit. Id. at 3(¶ 2). The chancellor granted the relief requested by Pluskat and found that the will, adoption, and deed were the result of Cupit’s fraud and undue influence. Id. Cupit appealed. Id.
¶ 44. On the issue of the adoption, Justice Diaz, writing for the supreme court, stated:
Cupit argues that Pluskat does not have standing to challenge the validity of the adoption and that Pluskat is barred by the statute of limitations pertaining to adoptions. In both of these assertions, Cupit is correct. But, once again, this case is highly unusual.
Based upon Miss.Code Ann. § 93-17-7 (1994), only a natural parent has a statutory right to object to the adoption of a child. In re J.J.G., 736 So.2d 1037, 1040 (Miss.1999). Also, there is a six-month statute of limitations for challenging final adoptions. Miss.Code Ann. § 93-17-15 (1994). We recognize that the adoption of children is sacred, and the finality of adoptions is of the utmost necessity. However, we are not dealing with the adoption of a child in this case. We are dealing with an adult man, with a law degree, who gained the trust and dependence of an elderly lady. Other states have recognized this problem and found that the heirs of a deceased person who adopted an adult do have standing to attack the adoption, [citations omitted]. In accord with these cases, we find that Pluskat does have standing to attack the adoption of Michael Cupit.
Furthermore, courts have the inherent power to vacate a judgment at a subsequent term of court when the judgment is void because of fraud in its acquisition. Whiteway Fin. Co. v. Parker, 226 So.2d 903, 904 (Miss.1969).
The chancellor found that the adoption was also the product of a “long[-]term plan and scheme” concocted and obtained by Cupit by fraud and overreaching. The adoption court was not informed of the existence of the deed, the will, the previous attempted adoption, or the fact that Cupit acted as Reid’s attorney. Therefore, the chancellor found that Cupit had committed a fraud on the adoption court. We affirm the chancellor’s ruling on this issue. Let it be clear that our findings concerning the adoption in this case are specific to the facts of this case.
Pluskat, 825 So.2d at 6 -7 (¶¶ 21-24) (emphasis added).
¶ 45. I am of the opinion that the instant case offers a factual scenario equally as unusual as, yet strikingly similar to, the facts in Pluskat. The result is that there is sufficient evidence to support the allegations raised by Illinois Central that Foster and his daughter, Virginia, may have committed a fraud on the court in the acquisition of the adoption decree.[7]
*1017 ¶ 46. I view Illinois Central in the same or similar role as Pluskat, who was a potential heir of Reid. Illinois Central’s argument is straightforward. I also do not believe there is any reason to distinguish the cases because one included an adult who was adopted and the other included children, who were offered for adoption by their adult parents. The adoption decree was not requested and granted based on the best interest of the children and with the expectation that Foster would provide for the care of the children. Instead, the adoption decree was an attempt to place the children in an economic position that they would not otherwise be entitled to receive benefits as a result of being the unemancipated “children” of Foster. Just as the adoption of Cupit by Reid deprived her lawful heirs of property as a result of fraud on the court, the adoption of the children here by Foster deprived Illinois Central of its property. Illinois Central is entitled to the same protection as an individual. Of paramount import was the supreme court’s holding in Pluskat that “courts have the inherent power to vacate a judgment at a subsequent term of court when the judgment is void because of fraud in its acquisition.” Id. at 7(¶23) (citing Whiteway Fin. Co., 226 So.2d at 904) (emphasis added). Just as in Pluskat, when there is any deception or fraud upon the court, the statute of limitations imposed by section 98-17-15 should not prevent the court from subsequently considering whether indeed there was such fraud on the court.
¶ 47. This Court also addressed the issue of fraud upon the court in Tirouda v. State, 919 So.2d 211 (Miss.Ct.App.2005).[8] The appellant, an Algerian national, had fraudulently procured a delayed birth certificate from the Chancery Court of Laud-erdale County and attempted to use it to obtain a United States passport. Id. at 212(¶ 2). When he was on trial in federal court in California for making a false statement in his application, the chancellor who had issued the order releasing the delayed birth certificate was a witness for the government. Id. at (¶ 3). Thereafter, the chancellor entered a sua sponte order to show cause and for a hearing and then found that Zineddine Tirouda’s conviction of conspiracy to possess immigration documents by fraud and making false statements in his application for a United States passport was an indication that fraud was committed at the 1999 hearing in chancery court. Id. at 213(¶ 4). Based on that finding, the chancellor vacated her prior order issuing the birth certificate. Id.
¶48. On appeal, this Court held that the savings clause of Rule 60(b) of the Mississippi Rules of Civil Procedure grants a broad reserve of equitable power to the Mississippi courts to decide whether a judgment was procured by fraud by a party, mistake, or any other reason that justifies relief from that order. Id. at 214(¶ 7). We also held that a motion to vacate based on fraud upon the court falls within the savings clause and thus is not limited to the six-month period imposed on a motion under Rule 60(b)(l)-(3). Id. at (¶ 8).[9]
*1018 ¶ 49. But we noted in Tirouda that, because Rule 60(b) relief based upon fraud upon the court is to be reserved for the most egregious conduct, a showing of an unconscionable plan or scheme is required. Id. at 216(¶ 11). We found that because he had committed fraud upon the court and attempted to use the courts as his. instrument to perpetrate his fraud upon the United States, the promotion of justice could not allow Tirouda to retain the birth certificate to which he was not entitled. Id. at 217(¶ 15).
¶ 50. Based on these cases, I am convinced that the majority is incorrect and find that the chancellor committed reversible error. Indeed, given the rather unusual facts regarding the adoption, I am of the opinion that the proceedings in this case should be reopened, procedural bars notwithstanding. My opinion is limited to the conclusion that the facts asserted require a finding that the chancellor erred in denying Illinois Central leave to intervene and to file its complaint. Although I find that Illinois Central should have been allowed to proceed, I do not extend that finding to a final conclusion on the merits of its claims. Indeed, evidence will need to be submitted and reviewed by the court.[10] The court will then need to make a finding as to whether there was a fraud on the court and award the appropriate remedy, if any.
¶ 51. Pluskat and Tirouda do indicate that there is legal precedent that would warrant a relaxation of the strict application of the usual procedural rules and statutes of limitation. Pluskat and Tirouda were based on unusual circumstances, as is the present case, involving fraud and more importantly a possible fraud upon the court. As in Pluskat, the apparent intention behind the adoption was not to secure the best interests of the children but to secure an economic interest.
¶ 52. Foster petitioned the chancery court to adopt his grandchildren, knowing full well that he was terminally ill and that he was refusing treatment for that illness. In addition, while the natural parents consented to the adoption and, thus, voluntarily relinquished their parental rights, the children may have never left the physical custody and care of the very same parents whose parental rights were terminated. Moreover, Foster’s daughter, the natural mother of the children, surely knew of her father’s terminal illness. At the time of the adoption, Foster was within weeks of his death. In fact, Foster died as a direct and foreseeable consequence of his illness slightly over a month after the adoption was finalized. It should be noted that the majority does not even attempt to analyze these facts. It was certainly not in the “best interests” of the children to allow an adoption where the adopting sole parent is *1019 a man with a terminal illness, and he becomes the primary person responsible for their well-being. The fatal flaw in the majority’s logic, in my opinion, is that it does not see the damage done to the public policy behind the law of adoptions and the potential for misuse of this case as controlling precedent in the future. The only possible reason for the chancellor to allow this adoption was to give the children economic benefits to which they would otherwise not be entitled. To do that, the pex*-son or entity from whom these benefits were to be taken, Illinois Central, should be given due process and its day in court. The law and the courts of this State should not be used for this purpose. This is not justice! This is not fairness! This was a scam! Now, the majority of this Court sanctions this scam, which will be repeated in the future.
¶ 53. If the adoption were vacated, the children’s physical circumstances would likely remain unchanged. Their adoptive father is deceased, and it appears that they are in the custody of their natural parent or parents. In fact, there is nothing in the record that indicates that the children ever left, or intended to leave, the custody and control of their natural parents — the same individuals who consented to the termination of their parental rights. The result of their consent to adoption was to completely sever their rights as the children’s natural parents. Just over a month later, the children may have been back in the custody and care of the very same parents whose parental rights were just terminated. The record does not reveal who gained custody of the children after Foster’s death. If indeed the natural parents regained custody of the children, it seems as if this fact would evidence that the adoption was a sham, and that they committed a fraud on the court by securing the adoption.
¶ 54. I continue in my analysis to address another issue raised by the majority, specifically, the majority’s claim that Illinois Central’s claim is a purely economic interest. Typically, when “pure economic loss” or “the economic-loss doctrine or rule” is discussed, it is recognized that there is no recovery for such loss in tort actions or claims of negligence or of a defective product. See East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); E. Miss. Elec. Power Ass’n v. Porcelain Prods. Co. Inc., 729 F.Supp. 512, 514-15 (S.D.Miss.1990); Corporex Dev. & Const. Mgt., Inc. v. Shook, Inc., 106 Ohio St.3d 412, 835 N.E.2d 701 (2005); Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). However, as the majority notes, the “economic interest alone” language has found its way into suits dealing with intervention under Rule 24 of the Mississippi Rules of Civil Procedure. Although the chancellor, in his order denying Illinois Central’s motion to intervene, did not rely on Perry County v. Ferguson, 618 So.2d 1270 (Miss.1993), the majority does.
¶ 55. In Perry County, the supreme court stated the four prerequisites to an “Intervention of Right” under Rule 24(a)(2):
(1) The would be intervenor must make a timely application;
(2) He must have an interest in the subject matter of the action;
(3) He must be so situated that disposition of the action may “as a practical matter” impair or impede his ability to protect his interest; and
(4) His interests must not already be adequately represented by the existing parties.
Perry County, 618 So.2d at 1271. Although the majority recognizes that the Perry County court stated, “[ejconomic in *1020 terest alone is insufficient,” to intervene, it fails to include the subsequent language wherein the court stated:
Rule 24(a)(2) factors must be applied to the facts of each case. These requirements should be considered together and balanced against each other:
Intervention may be sought in a wide variety of situations involving unique facts and procedural postures.... Because Rule 24 attempts to address all of these situations, the facts and procedural posture of each case are important, and it is often true that general rules and past decisions cannot provide uniformly dependable guides.
Id. at 1272 (citing United States v. Texas E. Transmission Corp., 923 F.2d 410, 412 (5th Cir.1991)).
¶ 56. In Perry County, the county leased land to Leaf River Products, and its right to intervene was based upon facts that were not only purely economic, but which were also contingent and based upon a fear that the pulp mill would close if Leaf River Products sustained excessive litigation. Id. at 1273. The supreme court recognized that the county had the same interest as Leaf River Products, and that the county’s interests were adequately represented by Leaf River Products. Id. That is opposite of the situation we have in the instant case wherein there is no other party to represent the interest of Illinois Central, and clearly, Illinois Central has a “direct, substantial, legally protectable interest” in the adoption of the three minor children, which increased its liability under both Foster’s FELA suit and his retirement benefits.
¶ 57. Although the chancellor found that Illinois Central lacked standing to attack the adoption, he did recognize in his order denying Illinois Central’s motion to intervene that Whiteway Finance Co. v. Parker, 226 So.2d 903 (Miss.1969), provided that a court may set aside a final judgment where the decree is void because of fraud in its acquisition. The chancellor expressly recognized that this would “presumably be the case even in an adoption proceeding where there is a six[-]month statute of limitations against filing a collateral attack of a final judgment.”[11] Indeed, the Whiteway Finance court opined that “[cjourts have the inherent power to vacate a judgment at a subsequent term of court when the judgment is void because of fraud in its procurement or when the court lacks power to enter it.” Id. at 904. Clearly, the supreme court did not foreclose the court’s ability to set aside an order or judgment procured by fraud merely because it was an adoption.
¶ 58. The chancellor denied Illinois Central the right to intervene claiming that it did not have standing and that its “interest” arose only after the death of Foster. However, this truth is not so “tenuous” as the chancellor declares. In Jones v. Goolsby, 218 Miss. 847, 856-57, 68 So.2d 89, 93 (1953), the supreme court held:
It seems to be well-established by the decisions and the text-writers that when relief is sought against a decree which has been obtained by fraud, the same may be granted under the following circumstances: .... (3) A stranger to such a decree obtained through fraud whose interests are substantially affected by the decree may attack the same and have it set aside, insofar as his interests are affected, by a direct attack upon it *1021 by original bill in the nature of a bill of review.
(Emphasis added). In response to an argument presented that the complaining party had no interest at the time the divorce was granted, but only had an expectancy which could materialize in the event of the death of one of the players, the court stated that it was not persuaded by the argument. Id. at 863, 68 So.2d at 96. The Jones court went on to recognize that “[n]owhere in the Restatement of Judgments, in dealing with the right of collateral attack upon a void decree, [was] there a suggestion that the right depends upon the decree working an injury to the attacker at the time of the entry of the decree.” Id. In other words, Jones supports the premise that the chancellor and the majority are incorrect to conclude that Illinois Central has no right to intervene under Rule 24 because its “interest” did not arise until after Foster died.
¶ 59. I conclude with one further concern. Foster and Virginia did not act alone. Indeed, they were represented by counsel. It is unlikely that Foster and Virginia arrived at the decision to have Foster adopt the minor children, within days of his death, on their own. If licensed attorneys assisted in this fraud on the court, it should be brought to light and dealt with accordingly.
¶ 60. Accordingly, for these reasons, I would reverse the chancellor’s judgment and remand this case for further proceedings by the chancery court consistent with this opinion.
ROBERTS, J., JOINS THIS OPINION. MAXWELL, J., JOINS THIS OPINION IN PART.

. Foster's terminal illness provided a statutory basis for the court to terminate parental rights, if “the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child].]" Miss. Code Ann. § 93—15—103(3)(e)(i) (emphasis added).

. It simply defies logic and reason to believe that a chancellor, who was fully informed of Foster’s condition, would knowingly place three young children in the care of an elderly man who was suffering from a terminal disease and was incapacitated. It is plausible to argue that it may be in the children's best financial interest, but certainly, it is not in the best interest of their physical well-being and day-to-day care.

. The majority makes two arguments to distinguish Pluskat. First, the majority says, without elaboration, that Illinois Central is not the same as an heir. However, just like the heir in Pluskat, if the Court allows the adoption to stand then it will be only because of a fraudulent adoption that the children will receive economic benefits to which they would otherwise not be entitled. Second, the majority concludes that the children were not "culpable in the fraud.” This is a transparent argument. The children themselves may not have undertaken the fraudulent acts. However, their natural parents and grandfather did undertake the actions that were fraudulent and the children were to benefit. With the sanction of the chancellor and now this Court, they pulled a fast one and this case will be a blueprint for others to commit a fraud on unsuspecting third parties to obtain benefits *1017 to which they were never entitled. This case sets a dangerous economic precedent for the proper use of adoptions.

. It should be noted that the majority does not even attempt to distinguish this case.

. This Court has held that a non-party to the original action may not seek relief from a judgment under Mississippi Rule of Civil Procedure 60(b). Davis v. Stokes, 25 So.3d 392, (¶ 13) (Miss.Ct.App.2009) (At the time of this writing, no mandate has been issued in Davis. A motion for rehearing was filed with this Court on July 14, 2009. See M.R.A.P. 40(a). *1018 Therefore, the opinion is not final. See Miss. Transp. Comm’n v. Allday, 726 So.2d 563, 565-66(¶ 8) (Miss.1998)).

. This also poses a question as to whether the chancellor who granted the adoption and denied Illinois Central's motion for leave to intervene in the adoption matter may preside over and decide the motion if the case were remanded. Mississippi Rule of Evidence 605 provides that "[t]he judge presiding at the trial may not testify in that trial as a witness.” Here, upon remand, if the issue is whether there was a fraud on the court in the acquisition of the adoption petition, the chancellor would have to testify as to the manner in which the petition for adoption was presented, who appeared before the court, and what evidence was offered and received by the court. Hence, the judge would be a witness and, therefore, be barred from presiding over the trial or hearing. I am of the opinion that this prohibition would have been sufficient to prevent the chancellor from considering the motion for leave to intervene since it challenged the proceedings that occurred before the chancellor in granting the adoption.

. The chancellor recognized the decision of Pluskal by stating its citation, but he failed to address the facts of that unique case.